CATHERINE C. WELLS and SARAH E. WELLS,
Appellants,

*vs.*

LEE BUILDERS, INC.,
Appellee.

*Supreme Court, On Appeal, October 14, 1953.*

SOUTHERLAND, C. J., and WOLCOTT and TUNNELL, JJ., sitting.

*Daniel O. Hastings* and *Clarence W. Taylor,* of Hastings, Stockly & Walz, Wilmington, for appellants.

*Albert W. James* and *H. James Conaway, Jr.,* of Hering, Morris, James & Hitchens, Wilmington, for appellee.

WOLCOTT, Justice, delivering the opinion of the court:

On May 12, 1950, the appellants, two elderly widows, hereinafter called defendants,[1] entered into a contract for the sale of land with one Morgan, a nominee of the appellee, hereinafter called plaintiff. The contract was for the sale of two adjacent tracts of land in Elsmere, New Castle County. Erected on the two tracts is a double dwelling house in which the two defendants live, each on her own side.

By the contract, the plaintiff was obligated to pay down the sum of $1,000 and to pay the sum of $19,000 on the day of final settlement. Prior to the day of final settlement, the plaintiff was obligated to move the double dwelling house to a new location on a portion of the defendants' land reserved from the contract of sale. The contract purports to specify the manner in which the moving of the dwelling should be accomplished. The day of final settlement was fixed at September 1, 1950, which time was expressly declared to be of the essence of the contract.

The plaintiff made the initial payment of $1,000 but did not move the dwelling house prior to September 1, 1950. On Septem-

---

1. The husband of one of the defendants was a party to the contract but he is now deceased. He and his wife owned one of the tracts as tenants by the entireties.

ber 1, 1950, the parties entered into an agreement which extended the time for final settlement under the contract to on or before November 15, 1950, and ratified and confirmed in all its other terms the contract of May 12, 1950.

Thereafter, although the plaintiff had not moved the dwelling house to its new location, it, on November 1, 1950, served notice on the defendants that it proposed to hold final settlement under the contract on November 6, 1950. The defendants did not appear at the time and place specified in the notice. The plaintiff, thereupon, filed its complaint alleging a breach by the defendants of the contract of sale and praying that they be compelled to perform.

After trial, the Vice Chancellor entered judgment ordering the defendants to convey the land in question to the plaintiff upon the removal of the dwelling house by the plaintiff in accordance with the contract and upon payment by it of the balance of the purchase price. From this judgment the defendants have appealed.

It is fundamental law that a party seeking a decree for specific performance of a contract must, himself, have performed within the time specified his own obligations under the contract. 4 *Pomeroy's Equity Jurisprudence*, (5th Ed.) § 1407; *Jones v. Carpenter*, 13 *Del.Ch.* 172, 117 *A.* 559; *Coyle v. Kierski*, 10 *Del.Ch.* 229, 89 *A.* 598. It is, however, equally fundamental that the failure of a plaintiff to have performed his own obligation will be excused if he was prevented by the other party from performing his obligation. *Wilkins v. Evans*, 1 *Del.Ch.* 156; *Kittinger v. Rossman*, 12 *Del.Ch.* 276, 112 *A.* 388; *Morgan v. Wells*, 32 *Del.Ch.* 108, 80 *A.2d* 504.

We do not understand the parties to differ with the basic rules set forth above. They do, however, differ upon the application of the rules to this particular controversy. The defendants argue that the plaintiff having failed to perform its obligation of moving the dwelling house within the time specified, is not entitled to specific performance after the expiration of the time. The plaintiff admits it has not performed its obligation within the time, but argues that it was at all times ready and willing to do so but was prevented from so doing by the defendants' actions.

The answer to the contentions of the parties lies in the facts. The Vice Chancellor found as a fact that the plaintiff was at all times ready to perform its obligation and that the attitude of the defendants led the plaintiff to believe that they did not intend to perform their obligations, which fact excused the non-performance of the plaintiff. Our task, in view of this finding, is to determine whether the testimony and evidence support it.

It is apparent from the record that the defendants were dissatisfied from the very first with the bargain they had made, which they assert they were "high pressured" into. On at least two occasions, shortly after May 12, 1950, they made statements to employees of the plaintiff which might be construed as evidence of a formed intention on their part to breach the contract. It does not appear, however, that the defendants at any time clearly and unequivocally so informed the plaintiff. In addition, the defendants did not reply to several requests of the plaintiff prior to September 1, 1950 for permission to go on the land to commence moving the dwelling house.

While it is clear that the defendants were dissatisfied, it is clear, also, that the plaintiff found several matters about the transaction not to its liking. After May 12, 1950, the plaintiff learned of two apparent defects in the title of the defendants to the land in question. The first was an open estate in the chain of title, and the second was an injunction preventing the laying of utility pipes across a strip of land adjacent to the highway on which the lands in question fronted. The exact situation with respect to this injunction is not clear from the record, but it was of sufficient concern to the plaintiff to cause it to take steps to have the matter cleared up.

After the discovery of the two apparent defects in the defendants' title, the efforts of the plaintiff to enter upon the land for the purpose of moving the dwelling house ceased until some time after September 1, 1950. It may have been, as the plaintiff contends, that the reason was the unwillingness of the defendants, or it may have been, as the defendants contend, that the reason was the desire of the plaintiff to be assured of good title upon final settlement before going to any more expense. Whatever the reason may actually have been, we

think it was made immaterial by the extension agreement of September 1, 1950.

■ The various conditions we have referred to were still in existence on September 1, 1950. On that date, the original contract was confirmed and ratified and the time for final settlement extended for some two and one-half months. Of particular importance is a recital of fact in the extension agreement that "certain unforeseen difficulties have caused unavoidable delays in the fulfillment by both the sellers and the buyer of their respective obligations." The effect of the extension agreement, we think, was to wipe out any prior anticipatory breach of the contract by the defendants, or any action on their part which tended to prevent performance by the plaintiff of its obligation. Indeed, we think the plaintiff is precluded by its recital of fact from contending to the contrary. The result, therefore, is that for all practical purposes the determination of this controversy is to be made in the light of the facts as they developed between September 1 and November 1, 1950. The Vice Chancellor's finding must stand or fall upon these facts.

■ The situation on September 1, 1950 was fundamentally the same as it had been on May 12, 1950. The plaintiff was obligated to move the dwelling house to its new location in a manner satisfactory to the defendants and to pay the balance of the purchase price before it was entitled to have title to the premises conveyed to it. Under the law referred to above, its failure in either respect will defeat its prayer for specific performance, unless the defendants prevented it from so doing, or unequivocally refused to abide by their agreement.

The record contains no evidence that the defendants after September 1, 1950, clearly, distinctly and unequivocally stated an intention not to perform their obligation so as to make them guilty of anticipatory breach. See 12 *Am.Jur., Contracts,* § 393. Nor does the plaintiff make such a contention. The plaintiff argues that it was excused from the performance of its obligation by reason of the conduct of the defendants subsequent to September 1, 1950, and that it should have a judgment on that theory. See *Restatement of Contracts,* §§ 306, 374.

We think the record demonstrates that after September 1, 1950 the plaintiff was still urgently concerned with the two apparent defects in the defendants' title which were still unresolved as of that date. Thus, on September 7th, plaintiff's attorney wrote that the plaintiff had hopes of soon clearing them up and that when that was accomplished no further delay in the final settlement would be required. Again, on September 13th he wrote that the injunction matter had been cleared up but that no date for moving the dwelling house could be set until all defects in the defendants' title had been cleared up to the plaintiff's satisfaction.

These two letters, we think, demonstrate that as late as September 13th at least, the delay in the performance of the plaintiff's obligation was not due to obstructive tactics on the part of the defendants, but was caused primarily by an understandable reluctance on the part of the plaintiff to go to any further expense without assurance that it could get good title.

On September 20th, the plaintiff through its attorney by letter made an entirely new offer to the defendants through their attorney. This offer was not a fulfillment of the plaintiff's obligation under the contract, but was a proposal to effect final settlement in a manner quite different. The letter referred to the fact that the plaintiff desired to obtain a construction loan for the erection of its building, and that it was absolutely necessary for it to have fee simple title in order to obtain title insurance as a prerequisite to the loan. It was accordingly suggested that final settlement be held on September 29th in which fee simple title would be conveyed to the plaintiff and the deed deposited in escrow and, at the same time, the balance of the purchase price be deposited in escrow, delivery of both items to be made upon completion by the plaintiff of the work of moving the dwelling house.

On September 23rd in a letter, plaintiff's attorney again renewed the suggestion that an escrow arrangement be worked out in order to resolve the difficulties of settlement. The defendants in a subsequent meeting between the parties refused to make final settlement under the escrow arrangements proposed by the plaintiff. We can see no reason why they were not within their rights in so refusing.

Thereafter, a series of letters between plaintiff's attorney and defendants' attorney passed, discussing the manner and method of moving the dwelling house to its new location. Of particular concern to the defendants was the connection of sewer facilities about which there seems to have been some difficulty arising out of the injunction suit in Chancery which, presumably, affected the premises in question. This exchange of views continued until October 21st with the plaintiff continually suggesting final settlement prior to the moving of the dwelling house as required by the contract.

██ The plaintiff urges that it was at all times ready, willing, able and anxious to perform its obligation but that the defendants consistently refused to give their consent to the plaintiff to go upon the land in question and perform its obligation. It is true that the plaintiff asked such consent of the defendants' attorney. He, however, testified at the trial that he told the plaintiff he had no authority to give such consent and that it must be sought from the defendants themselves. As far as the record discloses, no direct request for such consent was made to the defendants subsequent to September 1, 1950. Furthermore, it seems doubtful, to say the least, that the plaintiff was required to obtain the consent of the defendants since it would seem that the contract of sale itself, impliedly at least, gave such necessary consent. Cf. *Fletcher v. Evans*, 140 *Mass.* 241, 2 *N.E.* 837; *Katsonas v. W. M. Sutherland Building & Construction Co.*, 104 *Conn.* 54, 132 *A.* 553.

██ We think the record fairly demonstrates that the plaintiff was reluctant, both before and after September 1, 1950, to go to any expense in the performance of its obligation under the contract to move the dwelling house until it was satisfied that it would in return receive a good fee simple title. No other conclusion seems possible in view of the several statements of the plaintiff that it could not start moving the dwelling house, as required, until it was satisfied that the defendants' title was free from doubt, and by its suggestion of the escrow arrangement designed to facilitate its construction loan and to protect it from possibly fruitless expense in moving the dwelling house.

Furthermore, there is no scrap of evidence throughout the entire record that the plaintiff ever took steps to force the defendants' hands. Despite its present argument that it sought by every means to fulfill its obligation, there is no indication whatsoever that it took any steps to actually provoke a refusal by the defendants to permit the plaintiff to proceed. If that had been done, the plaintiff's rights would have been clear. We think its lack of action in this obvious respect throws doubt on its anxiety to perform its obligation during the life of the contract.

It may be true as the plaintiff urges that the defendants were dissatisfied throughout the entire period of the contract with the bargain they had made. It may also be true, and, indeed, we think it probable, that the defendants were insisting upon letter compliance by the plaintiff with the terms of the contract. This insistence on their part may have stemmed from their dissatisfaction. The plaintiff, however, made its bargain and it may not complain that the defendants insisted upon strict compliance with the terms proposed originally by itself.

In the absence of any proof showing the actual prevention by the defendants of performance by the plaintiff or a direct refusal to permit the plaintiff to perform, we do not think the plaintiff has sustained the burden which is cast upon it of showing circumstances excusing its failure to perform the condition precedent called for by the contract, before it was entitled to a conveyance. It follows that the finding of the Vice Chancellor in this respect was error.

The conclusion we have reached makes it unnecessary to consider the other arguments made by the defendants.

A mandate will be entered reversing the judgment of the Court of Chancery, and remanding the cause for further proceedings in connection with the defendants' counterclaim for damages.