COURT OF CHANCERY
OF THE
STATE OF DELAWARE

PATRICIA W. GRIFFIN
MASTER IN CHANCERY

CHANCERY COURTHOUSE
34 The Circle
GEORGETOWN, DELAWARE 19947

Final Report:     February 22, 2018
Draft Report:
Date Submitted:   November 30, 2017

Dorey L. Cole, Esquire
Moore & Rutt, P.A.
122 West Market Street
PO Box 554
Georgetown, DE 19947

Dean A. Campbell, Esquire
Law Office of Dean A. Campbell, LLC
20175 Office Circle
PO Box 568
Georgetown, DE 19947

RE:   *Daniel F. Morton, Jr. v. Ernest L. Rogers, Jr, Tammie L. Rogers, and*
      *Charles Douglas Morton, Jr.*
      C.A. No. 2017-0603-PWG

Dear Counsel:

Daniel F. Morton, Sr. (hereinafter "Daniel") filed a petition against

Respondents Ernest Rogers, Jr. (hereinafter "Ernest"), Tammie Rogers (hereinafter

"Tammie"), and Charles Douglas Morton, Jr. (hereinafter "Charles), on August 22,

2017 seeking a declaratory judgment confirming the validity of a contract for the

sale of real property, specific performance of the sales contract, alternative relief

and damages, costs and attorney's fees based upon intentional misrepresentation,

equitable fraud, common law fraud and civil conspiracy.[1]  Pending before me is Respondents' October 12, 2017 motion to dismiss the petition under Court of Chancery Rule 12(b)(6).  Respondents argue that Daniel has failed to state a claim for specific performance because the contract lacks definite essential terms and is unenforceable, and once specific performance is denied, the other claims should be dismissed for lack of subject matter jurisdiction because those claims seek remedies at law.  The motion is fully briefed.

I recommend that the Court deny Respondents' motion to dismiss.  This is a final report.

## BACKGROUND

Daniel entered into an alleged contract to purchase approximately two acres of land from Ernest and Tammie (hereinafter "two-acre property"), which was part of the 118 acres they owned on the west side of Blacksmith Shop Road in Greenwood, Delaware, in June 2014.  The contract is memorialized in two receipts dated June 17, 2014 and October 8, 2014 and signed by Daniel and Ernest.  The June 2014 receipt stated:

> I DANIEL F. MORTON ON THIS DAY OF JUNE 17, 2014 GIVE TO ERNIE ROGERS [$]1,000.00 TOWARD THE PURCHASE OF LAND, SOUTH AND ADJACENT TO CHARLES, CHUCK,

---

[1] I may use first names in pursuit of clarity and intend no familiarity or disrespect.

> MORTON.  THIS LAND CONSIST[S] OF PLUS OR MINUS (2) ACRES, MEASURING 284 ft. BACK FROM ROAD (BLACKSMITH SHOP ROAD) AND APPROXIMATELY 300' PLUS ON FRONT DEPENDING WIDTH OF RIGHT OF WAY [letters scratched out] OR SERVICE LANE REQUESTED BY MR. ROGERS.

The October 2014 receipt provided:

> I DANIEL F. MORTON GIVE TO ERNIE ROGERS THE 2<u>nd</u> $1,000.00 PAYMENT TOWARD THE PURCHASE OF LAND, SOUTH AND ADJACENT TO CHARLES MORTON.  THIS LAND CONSIST[S] OF PLUS OR MINUS (2) ACRES, MEASURING 284 FEET BACK FROM BLACKSMITH SHOP ROAD AND APPROXIMATELY 300' PLUS ON FRONT DEPENDING ON WIDTH OF MR. ROGER'S RIGHT OF WAY OR SERVICE LAND TO THE SOUTH AS REQUESTED BY MR. ROGERS.  THIS IS THE <u>SECOND</u> PAYMENT AND WE ARE CURRENTLY WAITING FOR AN OFFICAL [sic] SURVEY.  THIS PAYMENT IS TOWARD THE ORIGINAL AGREED PURCHASE PRICE TOTAL OF [$]29,500.00 (TWENTY NINE THOUSAND, FIVE HUNDRED DOLLARS), WHICH WASN'T NOTED ON THE FIRST RECEIPT.

Daniel asserts that the parties originally agreed to settle "after completion of the survey and subdivision," but "at the Rogers' request the parties agreed instead for Daniel to begin making monthly payments toward the purchase price, with settlement to occur at such a time as the purchase price was paid in full."[2]

In addition to the June and October 2014 payments, Daniel made 26 monthly payments towards the purchase of the two-acre property between

---

[2] Verified Pet. ¶ 17 (Aug. 22, 2017).

December 2014 and January 2017.[3]  Daniel provided written receipts for each payment, with Ernest signing each receipt, sometimes after the notation "payment received by" or "received by."[4]  Ernest and Tammie owned the two-acre property by joint tenancy with the right of survivorship.  Tammie did not sign any of the receipts.  Daniel alleges that Tammie "was present during [the contract's] negotiation and execution and [she] provided every indication that she accepted its terms and Mr. Rogers' authority to bind her to the same."[5]  He also asserts that Tammie was present "almost every time a monthly payment was delivered and accepted" by Ernest, and, on occasion, Ernest would hand the funds directly over to Tammie.[6]

Daniel contends that he contacted the Rogers about completing the survey and purchase of the two-acre property in the spring of 2016, but they indicated the "survey could not be completed until after the first of the year" because of the terms of an existing farm lease that would expire on December 31, 2016.[7]  Daniel

---

[3] Daniel presented evidence he has paid a total amount of $16,500 on the $29,500 purchase price, and made payments in the amount of $1,000 in June, October and December 2014, and May and June 2015.  The remaining 23 monthly payments were for $500. *Id.* Ex. C, D.
[4] *Id.* ¶ 18, Ex. D.
[5] *Id.* ¶ 14.
[6] *Id.* ¶¶ 19-20.
[7] *Id.* ¶ 23.

presented evidence that his son, who he intended to live on the property, had house plans drawn up in July 2016 to build a house on the 2-acre property.

Through a deed dated November 10, 2016, Ernest and Tammie transferred their entire 118-acre property, without payment of monetary consideration and without reserving the two-acre property, to Charles. Subsequent to that transfer, the Rogers continued to accept monthly payments from Daniel on the two-acre property on November 21, 2016, December 20, 2016, and January 20, 2017. Daniel claims that, between January 20th and mid-February 2017, he received permission from the Rogers to survey the two-acre property and, on one occasion, Charles joined him to assist with the measurements in placing corner markers on the property but did not inform Daniel that the Rogers had deeded the entire 118-acre property to him. During the same time, the Rogers began asking to extend the proposed service lane from 10-15 feet to 40-50 feet. Then in mid-February 2017, Charles asked Daniel to contact a particular attorney, and the attorney told Daniel about the transfer between the Rogers and Charles, which the attorney said was a gifted transaction, and stated his view that the contract was unenforceable and invalid.

## ANALYSIS

### A. Standard of review for failure to state a claim under Rule 12(b)(6)

The Court may dismiss parties' claims for failure to state a claim under Court of Chancery Rule 12(b)(6). The facts for purposes of the motion to dismiss under Rule 12(b)(6) are drawn from the complaint and all well-pled allegations in the complaint are assumed to be true and the petitioner receives the benefit of all reasonable inferences.[8] Conclusions in the complaint are not accepted as true without allegations of facts to support them.[9] But vagueness or lack of detail are not sufficient grounds alone to dismiss for failure to state a claim so long as the complaint provides the defendant with notice of the claim.[10] Failure to plead an element of a claim is grounds for dismissal of that claim.[11] A broad brush must be used in determining sufficiency of claims – whether a plaintiff may recover under any reasonably conceivable set of circumstances susceptible of proof.[12] If recovery on a particular claim is not reasonably conceivable, then the Court grants the

---

[8] *See In re Tri-Star Pictures, Inc., Litig.*, 634 A.2d 319, 326 (Del. 1993) (citation omitted); *Prairie Capital III, L.P. v. Double E Holding Corp.,* 132 A.3d 35, 49 (Del. Ch. 2015).

[9] *In re Tri-Star Pictures, Inc., Litig.*, 634 A.2d at 326.

[10] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, 27 A.3d 531, 536 (Del. 2011); *Morgan v. Wells*, 80 A.2d 504, 505 (Del. Ch. 1951).

[11] *Cf. Pulieri v. Boardwalk Properties, LLC*, 2015 WL 691449, at *5 (Del. Ch. Feb. 18, 2015); *Zebroski v. Progressive Direct Ins. Co.,* 2014 WL 2156984, at *6 (Del. Ch. Apr. 30, 2014).

[12] *Cent. Mortg. Co.,* 27 A.3d at 536, citing *Savor, Inc. v. FMR Corp.,* 812 A.2d 894, 896-97 (Del. 2002).

motion and dismisses that claim under Rule 12(b)(6). If recovery is reasonably conceivable, the motion to dismiss is denied.[13]

### B. Standard of review for specific performance

Daniel seeks specific performance of his contract with the Rogers for the sale of the two-acre property.[14] A party seeking specific performance of an agreement for the sale of real estate must establish by clear and convincing evidence that he has a valid contract, he is ready, willing and able to perform his obligations under the contract, and that the balance of equities tips in his favor.[15] He must also show that no adequate legal remedy exists.[16] Specific performance is an "extraordinary remedy" available at the discretion of the court.[17] The legal standard here is whether it is reasonably conceivable that Daniel can establish a right to specific performance of the real estate contract by clear and convincing evidence.

---

[13] *Cf. Pulieri*, 2015 WL 691449, at *5; *In re Tri-Star Pictures, Inc., Litig.*, 634 A.2d at 326; *Spence v. Funk*, 396 A.2d 967, 968 (Del. 1978).

[14] In their reply, Respondents state they are not claiming there was "no contract between the parties" but that the contract did not sufficiently identify essential terms necessary for specific performance. Resp'ts' Reply Br. 4-5 (Nov. 30, 2017).

[15] *Cf. Pulieri*, 2015 WL 691449, at *5 (*citing Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1158 (Del. 2010)); *Walton v. Beale,* 2006 WL 265489, at *3 (Del. Ch. Jan. 30, 2006).

[16] *W. Willow-Bay Court, LLC v. Robino-Bay Court Plaza, LLC*, 2007 WL 3317551, at *12 (Del. Ch. Nov. 2, 2007).

[17] *Pulieri*, 2015 WL 691449, at *6.

## C. Is it reasonably conceivable that Daniel can prove a valid contract exists for specific performance?

The essential terms of a real estate contract are the names of the buyer and seller, description of the property to be sold, sales price or the means of determining the price, the terms and conditions of the sale, and the signature of the party to be charged.[18]  Specific performance will not be granted if the terms of the contract are unclear or if the court has to supply the meaning to essential terms of a contract.[19]  In determining whether contract terms are sufficiently definite to support specific performance, the court avails itself of the usual contract construction aids, including common usage, reasonable implications of fact, and consideration of the uncertain part of the contract "in its relation to the contract as a whole."[20]  Ambiguity can be explained by oral testimony or other evidence, and the intention of the parties disclosed by "presumptions arising in the light of the facts and circumstances and by the use of common sense."[21]  An agreement may be enforceable "even where some of its terms are left to future determination."[22]

---

[18] *Id.*
[19] *Walton*, 2006 WL 265489, at *3.
[20] *Lee Builders, Inc. v. Wells*, 92 A.2d 710, 714 (Del. Ch. 1952), *rev'd on other grounds*, 99 A.2d 620 (Del. 1953).
[21] *Id.*
[22] *Estate of Osborn ex rel. Osborn v. Kemp*, 2009 WL 2586783, at *8 (Del. Ch. Aug. 20, 2009), *aff'd sub nom. Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153 (Del. 2010).

Respondents argue that Daniel's claim for specific performance fails because the real estate contract lacks sufficiently definite essential terms to be enforceable. Respondents claim the missing essential terms are a definite settlement date, a sufficiently detailed description, and Tammie's signature. They also contend that the absence of Tammie's signature violates the Statute of Frauds and, without her signature, the contract is unenforceable because Ernest, a joint owner with the right of survivorship with Tammie, did not have the legal capability to convey the property since the contract intended the sale of a "fee simple interest."[23] Further, they assert that the need to obtain third-party approvals prior to conveyance of the two-acre property – for the subdivision from the county's planning and zoning office and for an entrance permit from the Delaware Department of Transportation (hereinafter "DelDOT") – precludes specific performance.

Daniel responds that the two-acre property is uniquely suited to meet Daniel's purpose, and that the contract addresses all of the essential terms. He asserts that the June and October 2014 receipts memorialize contract terms, including the $29,500 price, sufficiently describe the property, and contain Ernest's signature. He further argues that the settlement date was to occur when the price

---

[23] Resp'ts' Reply Br. 6.

was paid in full, which the parties could ascertain based upon the payment arrangement; the survey and subdivision are not material to specific enforcement of the sales contract; the Rogers are equitably estopped from claiming the lack of a survey and subdivision as deficiencies invalidating the contract, since they prevented Daniel from obtaining the survey until the end of 2016; and Tammie, through her words and acts, evidenced her agreement to the contract and held Ernest out as having apparent authority to act as her agent. Further, Daniel claims that partial performance through his payments, and the Rogers' acceptance of those payments, at generally monthly intervals from June 2014 through January 2017, excepts the contract from the Statute of Frauds requirement that contracts for the sale of lands be signed by the person(s) charged. And, even if it is determined that only Ernest is bound by the contract, Daniel alleges that Ernest's share of the joint tenancy can be severed through his actions and a tenancy in common created though the sale of Ernest's one-half interest in the property.

Here, I conclude it is reasonably conceivable Daniel can prove, by clear and convincing evidence, that a valid contract exists for purposes of awarding specific performance. First, I do not find Respondents' argument that the lack of an exact settlement date invalidates the contract persuasive. Courts have not always required that a real estate contract contain an exact settlement date, but instead

have looked at whether the parties' intention as to the timing of the settlement can be determined.[24] In *Walton v. Beale*, a draft written contract between the parties contained a settlement date; however, that date had long since passed without a new date being set.[25] The Court found that since the parties "either had or planned to set a settlement date" at all times after the draft contract was prepared and before the dispute arose, the settlement date was sufficiently definite.[26] The *Walton* Court looked beyond the expired date in the draft contract to determine the parties' intentions – or plans – as to the timing of settlement, based upon the circumstances surrounding their agreement. Here, it is reasonably conceivable that evidence can be presented to show the parties' intentions concerning the timing of settlement.

The Court's holding in *Pulieri v. Boardwalk Properties, LCC* concerning the definiteness of the timing of the property transfer is distinguishable from this case.

---

[24] *Cf. Estate of Osborn ex rel. Osborn*, 2009 WL 2586783, at *8 (the Court held the parties understood that settlement would occur "sometime after" a particular date assuming that the party purchasing the property performed his obligations "in the interim"); *Walton*, 2006 WL 265489, at *5; *Heckman v. Nero*, 1999 WL 182570, at *4 (Del. Ch. Mar. 26, 1999) (holding the contract does not fail because "no time was provided for settlement," because "a reasonable time will be implied," if there is no provision as to the time of performance in the contract). Respondents' reliance on *River Enterprises, LLC v. Tamari Properties, LLC*, 2005 WL 356823 (Del. Ch. Feb. 15, 2005), is misplaced. In *River Enterprises, LLC,* the Court stated that the contract "reflect[ed] the parties' agreement on all essential terms: price, date of settlement, and the property to be sold." *Id.* at *2. Since the contract contained a specific settlement date, the parties' intention as to the settlement date was not at issue. That Court held that the security for the deposit was not an essential term. *Id.*

[25] *Walton*, 2006 WL 265489, at *2-*3.

[26] *Id.* at *5.

In *Pulieri*, property was transferred between the parties under an oral agreement with the obligation that it be transferred back "upon the happening" of certain conditions (when the financial health of certain entities improved and when a particular individual's interests in those entities had been removed).[27] The Court found that the timing of retransfer was not sufficiently definite to prove specific performance because "upon the happening" was not defined, there was no metric specified for discerning when the financial health of the entities had improved, and the exact entities involved were not defined.[28]

Unlike the *Pulieri* case, here, the parties' obligations were not controlled by vague metrics or factors. It is reasonably conceivable that, as Daniel asserts, the settlement date was to occur when the price was paid in full, and that the parties planned to set a date, based upon the payment history and practices associated with the contract.[29] I conclude that it is reasonably conceivable that, in this case, the parties' intention as to the timing of settlement could be ascertained once the evidence is fully developed.

---

[27] *Pulieri*, 2015 WL 691449, at *7.

[28] *Id.*

[29] Respondents rely on the varying amount of the payments ($1,000 or $500) to support the indefiniteness of the settlement date. The Petition alleges that, although five of the 28 payments were for $1,000, the remaining 23 monthly payments, and every payment between August 2015 and January 2017 (when this dispute arose), were consistently for $500. *See* Verified Pet. Ex. C, D.

Second, I find that it is reasonably conceivable that Daniel can prove that the property description in the contract, an essential term, is sufficiently definite. "A property description is adequate if it renders with sufficient certainty the grantor's intention respecting the quantity and location of the land to be conveyed."[30] The description does not need to "set forth precise dimensions in formal metes and bounds."[31] Respondents argue that the size of the service lane was a subject of disagreement between the parties and that the nature of the service lane – whether a physical lane or easement – was not defined. Daniel responds that the contract unambiguously depicts the service lane as the southern boundary line of the property and that the exact acreage and location of lines would be determined through a survey, which typically occurs after a sales contract is executed. I note that Daniel alleges that the disagreement about the size of the service lane arose in January 2017 – long after the parties entered into the contract and after the Rogers had already transferred the property to Charles. I find the evidence, once fully developed, could show the Rogers' intention as to the location and quantity of the property to be conveyed to Daniel was sufficiently definite to support specific performance.

---

[30] *Walton*, 2006 WL 265489, at *5.
[31] *Heckman*, 1999 WL 182570, at *4 (finding the property description sufficiently definite, even though the parties were unaware of the precise acreage but had walked the property line).

Third, Respondents argue that there is no valid contract for specific performance because Tammie, who was a joint tenant with right of survivorship, did not sign the receipts memorializing the contract or any of the receipts, and that Daniel alleged that she was present for the negotiation and execution of the contract but not that she "joined the contract."[32]  Further, if Tammie's words and actions are deemed to constitute an oral agreement, Respondents contend that there is no evidence for the Court to determine if Tammie agreed to the essential terms.[33] Respondents argue Daniel's reliance on Ernest's apparent authority to act as Tammie's agent is not supported by law and that Ernest, as only a joint owner, did not have the legal capability to convey the full property interest envisioned by the contract.[34]

Respondents assert the absence of Tammie's signature, in itself, voids the contract for purposes of specific performance pursuant to *Pulieri*.  The Court in *Pulieri* did define essential terms for a real property contract to include "the signature of the party to be charged."[35]  And, the signature requirement is consistent with the Statute of Frauds, which provides that actions cannot be

---

[32] Resp'ts' Mot. to Dismiss 8 (Oct. 6. 2017).
[33] Resp'ts' Reply Br. 4-5.
[34] *Id.* at 5-6.
[35] *Pulieri*, 2015 WL 691449, at *6.

brought to enforce the sale of lands "unless the contract is reduced to writing, or some memorandum, or notes thereof, are signed by the person to be charged therewith."[36]  However, there is a well-established exception to the Statute of Frauds that partial performance of an oral contract may be enforced by specific performance.[37]  The actual part performance must be an act which indicates the "mutual assent" of the parties to the contract, including "making partial or full payment for the land."[38]  It is evident that, in any oral contract, there would not be signatures of the parties.  Although the *Pulieri* Court defined essential terms for a **written** real estate contract, it analyzed the terms of an **oral** contract between the parties in that case, and declined to order specific performance because of indefinite essential terms and not due to the absence of signatures.  In this case, Daniel alleges he had a contract which was memorialized in writing and signed by Ernest.  Daniel could show that the contract satisfies the Statute of Frauds requirements for contracts for the sale of land as relates to Ernest.  As for Tammie, Daniel contends there is partial performance of the contract because he remitted, and Ernest and Tammie accepted, partial payments on the contract. He argues that Tammie is obligated under the contract through her words and acts because she

---

[36] 6 *Del. C.* § 2714(a).
[37] *Walton*, 2006 WL 265489, at *4; *Heckman*, 1999 WL 182570, at *3.
[38] *Walton*, 2006 WL 265489, at *4.

held Ernest out as her apparent agent in this agreement, and she was present when the monthly payments were delivered and accepted some of those payments personally from Ernest, among other acts. Further, Daniel asserts that the Respondents are equitably estopped from claiming that the Statute of Frauds forecloses the contract, since Daniel took actions detrimental to him in reliance on the Respondents' conduct.[39] I find that it is reasonably conceivable that Daniel could prove that there was an oral contract with Tammie, based upon similar terms as the memorialized contract with Ernest, and that there was partial performance of the contract sufficient to obligate Tammie. I, therefore, do not need to analyze Daniel's apparent agent and equitable estoppel arguments at this time.

Respondents argue that since the property was held jointly, the contract was unenforceable, regardless of Ernest's actions, without Tammie's agreement.[40] Although Ernest and Tammie held the two-acre property jointly with the right of survivorship, at the time the alleged contract was entered into, Ernest's actions alone can sever the unities of the title, and he can sell his interest in the property

---

[39] Pet'r's Answering Br. 21-22 (Nov. 13, 2017).

[40] Resp'ts' Am. Opening Br. on Mot. to Dismiss 14 (Oct. 12, 2017). Respondents claim that the contract was for a fee simple interest in the property and invalid if only a partial interest is being conveyed. Resp'ts' Reply Br. 6-7. The factual record, once developed, will help address this argument.

separately from Tammie's interest.  If one of the joint tenants sells their interest in the property, they break the joint tenancy and create a tenancy in common.[41]

Finally, Respondents argue that since the two-acre property has not been subdivided from the 118-acre parcel, specific performance is inappropriate because the consent of third parties, such as the Sussex County office of planning and zoning and DelDOT, is needed for the contract to be enforced.  This Court has held that governmental approvals necessary for the completion of the sale are not a bar to specific performance.[42]

Finally, Respondents argue that Daniel has not performed his obligations under the alleged contract and has not even obtained the survey on the two-acre

---

[41] *In re Ellingsworth*, 266 A.2d 890, 891 (Del. Ch. 1970); *Korn v. Korn*, 2015 WL 1862784, at *7 (Del. Ch. Apr. 22, 2015) ("[t]he common law has long recognized a right to sever the unities [of a joint tenancy with the right of survivorship] and create a tenancy in common through sale of one owner's interest").

[42] *Heckman v. Nero*, 2000 WL 1041226, at *7, n. 2 (Del. Ch. May 31, 2000) ("Impliedly, this Court found in the *Memorandum Opinion* that the fact that consummation of the sale would require the assent of Planning and Zoning was not a bar to specific performance").  The application of the defense of impossibility of performance would be premature in this case, since there is no evidence that the necessary governmental approvals have been sought and refused. *See id.* at *4. *See generally, Grynberg v. Burke*, 1981 WL 17034, at *8 (Del. Ch. Aug. 31, 1981) ("A promisor is bound to perform his contract unless it was unlawful when made, or has since become impossible of performance through no fault of his. This impossibility may be caused . . . by governmental act").  Respondents rely on *W. Willow-Bay Court, LLC v. Robino-Bay Court Plaza, LLC*, 2007 WL 3317551 (Del. Ch. Nov. 2, 2007), in which the Court found specific performance to be inappropriate where the contract at issue was contingent upon the seller's obtaining a third-party's consent, and that consent could be withheld regardless of the seller's actions.  Respondents' reliance on *Willow-Bay Court* is misplaced because, unlike the third party in that case, the governmental entities follow objective criteria in determining whether a minor subdivision is approved.

property needed to obtain governmental approvals.[43] Daniel responds that Respondents should be equitably estopped from asserting nonperformance of the survey because they prevented him from obtaining a survey until 2017, citing the terms of their agricultural lease.[44] Respondents reply that "it is blatantly obvious" that the existence of an agricultural lease would not preclude the performance of a simple survey, making Daniel's reliance on such a statement unreasonable.[45]

Equitable estoppel may be invoked when a party intentionally or unintentionally leads another, relying on that conduct, to change his position to his detriment.[46] The party claiming estoppel must show that he lacked knowledge or the means to obtain knowledge of the truth of the facts in question, relied on the conduct and suffered a prejudicial change of position as a result.[47]

The factual record needs to be developed to show whether Daniel performed his obligations under the contract and, if performance of the survey is an issue, whether equitable estoppel applies in this case.

### D. Is it reasonably conceivable that Daniel can show the other elements needed for specific performance of the contract?

---

[43] Resp'ts' Mot. to Dismiss 12.
[44] Pet'r's Answering Br. 18-19.
[45] Resp'ts' Reply Br. 11-12.
[46] *Heckman*, 1999 WL 182570, at *3.
[47] *Id.*

In addition to showing the existence of a valid contract, the party seeking specific performance needs to show that he is ready, willing and able to perform on the contract and that the balance of equities tips in his favor. Daniel argues that he is ready, willing and able to perform on the contract, has maintained sufficient assets to pay the entire balance of the purchase price, and in March of 2017, offered to tender the balance of the purchase price to either the Rogers or Charles. And Daniel believes the equities tip in his favor because he selected the property because of its size, location, surrounding, and proximity to family members and the private school attended by his son's children, for his son to build a house on the property; he has searched the nearby area and has been unable to locate a substitute property; Ernest intentionally misrepresented his authority to convey full title of the property and Tammie intentionally concealed her ownership interest; the Rogers intentionally delayed Daniel's efforts to perform a survey on the property; and Charles and the Rogers privately negotiated the conveyance of the property, with full prior knowledge of the sale contract with Daniel; and the Rogers withheld notice of the transfer to Charles from Daniel and accepted three more payments under the contract after the transfer.[48] Based upon the allegations before me, I conclude it is reasonably conceivable Daniel can show that he is ready, willing and

---

[48] Verified Pet. ¶ 61.

able to perform his contractual obligations, and that the balance of equities tips in favor of specific performance.

## CONCLUSION

Viewing the well-pled allegations and all reasonable inferences from those allegations most favorably to Daniel, I find that it is reasonably conceivable that Daniel could prove, by clear and convincing evidence, his claim for specific performance of the contract for the two-acre property. Accordingly, I recommend that the Court deny the Respondents' motion to dismiss, and that Daniel be allowed the opportunity to present his case based upon a fully developed record.

Further, with the Court's denial of the Respondents' claim that Daniel failed to state a claim for relief, I recommend that the Court conclude it is unnecessary to consider Respondents' arguments concerning the dismissal of Daniel's other claims for lack of subject matter jurisdiction.

This is a final report. Exceptions may be taken pursuant to Court of Chancery Rule 144.

Sincerely,

/s/ Patricia W. Griffin
Patricia W. Griffin
Master in Chancery

PWG/kekz