# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| TWIN WILLOWS, LLC, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | C.A. No. 2020-0199-PWG |
| | ) | |
| LEWIS PRITZKUR, TRUSTEE | ) | |
| FOR PATRICIA E. GIBBS, | ) | |
| DAWN R. ELLERY, GWEN | ) | |
| D. RINALDI, and ROBIN | ) | |
| SILVERMAN, | ) | |
| | ) | |
| Respondents. | ) | |

## MASTER'S REPORT

Date Submitted: April 25, 2022
Final Report: August 2, 2022

Mark Billion, Esq., BILLION LAW, Dover, Delaware; Peter K. Shaeffer, Jr., Esq., AVENUE LAW, Dover, Delaware, *Attorneys for Petitioner*

Jeffrey M. Weiner, Esq., LAW OFFICES OF JEFFREY M. WEINER, Wilmington, Delaware, *Attorney for Respondent Lewis Pritzkur, Trustee for Patricia E. Gibbs, Dawn R. Ellery, Gwen D. Rinaldi, and Robin Silverman*

Robert A. Penza, Esq., Christina B. Vavala, Esq., POLSINELLI PC, Wilmington, Delaware, *Attorney for Dawn R. Ellery, Gwen D. Rinaldi, and Robin Silverman*

Patricia E. Gibbs, Smyrna, Delaware, *Pro Se*

**GRIFFIN, M.**

Pending before me is a complaint in which a buyer seeks an extension of time to complete a land sale agreement, with a "time is of the essence" clause, and specific performance of that agreement. At issue is 81 acres outside of Smyrna, Delaware, which is being sold by a partition trustee appointed by the Court to sell the property for the disputing co-tenants. Buyer alleges that seller's misconduct prevented it from performing its obligations under the agreement. After trial, I conclude that the evidence does not show seller's or co-tenants' actions prevented buyer from fulfilling its obligations under the agreement, and I recommend that the Court enter judgment in favor of seller. This is a final report.

## I.     FACTUAL BACKGROUND[1]

*A. Introduction*

At the heart of this matter is a petition to partition approximately 81.9 acres located at 3431 South Dupont Boulevard, Smyrna, Delaware ("Property"), which was filed by Dawn Ellery, Gwen Rinaldi, and Robin Silverman (collectively, "Lawrence Respondents"), who together own a 50% interest in the Property, against Patricia Gibbs ("Gibbs"), the other 50% owner of the Property, in 2007.[2] On February 25, 2008, the Court appointed Lewis Pritzkur ("Pritzkur" or "Seller") as

---

[1] I refer to the transcript of the trial that occurred on March 23, 2022 and March 24, 2022 as "Trial Tr.," and to joint trial exhibits as "JX." I refer to the transcript of the December 15, 2020 hearing on Plaintiff's Motion for Default Judgment as ("MDJ Tr.").

[2] Docket Item ("D.I.") 1, ¶¶ 2, 3, 5.

partition trustee over the property and ordered that the Property be sold by private sale with the Court's approval.[3] There were difficulties selling the Property but, eventually, an agreement of sale for the Property ("Agreement") between Pritzkur and JMW Investments LLC ("JMW") was signed on September 27, 2016.[4] The Agreement was approved by the Court on November 14, 2016 and Pritzkur began providing quarterly status updates to the Court.[5]

## B. The Agreement

The Agreement provided buyer with a 120 day due diligence period ("Due Diligence Period") to evaluate the Property, which began running on the date of court approval.[6] At the end of the Due Diligence Period buyer could elect to terminate the Agreement and recover the deposit.[7] The Due Diligence Period ended on March 14, 2017. Following the Due Diligence Period, buyer had 24 months ("Permitting Period") to use "good faith, diligent efforts" "to apply for and obtain all necessary zoning, subdivision, environmental, local, state and federal approvals [("Approvals")] needed for [its] intended development of the Property."[8] Seller had

---

[3] *Pritzkur v. Ellery*, C.A. No. 12820-MG (Del. Ch.), D.I. 1, ¶ 14; *see also See Ellery v. Gibbs*, C.M. No. 2521-K (Del. Ch.). I take judicial notice of these filings. D.R.E. 201.

[4] *See* D.I. 5, ¶ 6; JX02 [hereinafter "Agreement"]; JX06.

[5] JX06; *see also Pritzkur v. Ellery*, C.A. No. 12820-MG (Del. Ch.), D.I. 18.

[6] Agreement, art. 3(a).

[7] *Id.*, art. 2(b).

[8] *Id.*, art. 3(b).

2

to permit buyer to access the Property during the Due Diligence and Permitting Periods, if buyer met certain conditions including "providing Seller not less than seventy-two (72) hours' notice of each intended entry onto the Property"("Notice Condition").[9] The Agreement gave buyer the option to extend the Permitting Period for two additional periods of six months each, for an extension fee.[10] If, after using good faith, diligent efforts, buyer was unable to obtain the Approvals, it could either waive the Approvals and proceed to settlement or terminate the Agreement.[11] Closing was to occur thirty days following the "outside date" (the earlier of buyer's receipt of the Approvals or the end of the Permitting Period), with buyer delivering the purchase price at settlement.[12] The Agreement has a time is of the essence clause, and buyer's sole remedies for seller's failure to perform any of the terms of conditions of the Agreement is to either sue for specific performance or terminate the Agreement and receive back the deposit and extension fees.[13]

## C. Performance Under the Agreement

On March 14, 2017, JMW assigned its interest in the Agreement to Petitioner Twin Willows, LLC ("Twin Willows" or "Buyer"), and Pritzkur approved the

---

[9] *Id.*, art. 3(a).

[10] *Id.*, art. 3(b).

[11] *Id.*, art. 3(b).

[12] *Id.*, ¶ 4(a).

[13] *Id.*, ¶ 10.

assignment the same day.[14]  With Pritzkur's agreement, JMW's principal assigned his ownership interest in Twin Willows to Henry Mast ("Mast") on May 16, 2017.[15] Following the assignment, the next communication between Pritzkur and Twin Willows was on August 8, 2017, when Pritzkur inquired about Twin Willows' progress seeking the Approvals.[16]  On August 17, 2017, Mast engaged Morris Ritchie and Associations ("MRA") to provide concept planning services, including a topographical survey, for the Property.[17]  On September 19, 2017, Pritzkur again asked Mast for a progress report, who responded that he was working with DelDOT and would like permission to enter the Property to clean it up with a bush hog for the topographical survey.[18]

On October 27, 2017, Pritzkur and Mast had a conversation, which was confirmed in an email from Pritzkur asking that Mast provide a letter indicating what he needs to do on the Property to "reasonably move forward" with the Agreement

---

[14] JX08.

[15] *See* JX16; JX17. The consideration for the assignment was $200,000.00 plus reimbursement of the $175,000 deposit. *Id.*  Twin Willows "has no income" and "is a holding company for a land contract." Trial Tr. 258:22-259:1.

[16] JX162.

[17] JX20.

[18] JX21.  It appears that Mast or others undertook some work on the Property during this time period, although the nature and extent is uncertain. *E.g.*, Trial Tr. 267:11-12; Mast Dep Tr. 25:1-9; *id*. 28:15-29:6; *id*. 33:23-34:5; JX21; JX23.

and "giving 2-3 weeks advance notice so [Pritzkur] can give enough advance notice to Mrs. Gibbs."[19] The email also stated that Pritzkur intended to be on the Property when Twin Willows' agents are on the Property, and offered to provide law enforcement assistance "[i]f a serious confrontation should arise which would endanger the personal safety of your representatives."[20] On or about December 21, 2017, it appears Twin Willows reported to Pritzkur that it had made contact with Gibbs and she gave permission to bring equipment onto the Property to clear brush to facilitate surveying and engineering work.[21]

At that time, Mast testified that he continued to go onto the Property, giving the required 72 hours' notice to Gibbs, not Pritzkur.[22] At Gibbs' request, Pritzkur met with her on January 23, 2018 to discuss her issues related to Twin Willows' performance under the Agreement.[23] She requested two days' notice before Twin

---

[19] JX23. The 2-3 weeks' notice exceeded what was required in the Agreement, which Mast testified presented problems for him. *See* Agreement, art. 3(a); Trial Tr. 267:2-13. Pritzkur was aware he was not getting notices from Mast in August or September 2017. Pritzkur Dep. Tr. 121:13-16.

[20] JX23.

[21] JX27, ¶ 6. In addition, on November 6, 2017, Pritzkur emailed Mast's attorney requesting an update and reminding him about the Notice Condition. D.I. 106, Ex. CC.

[22] Mast Dep. Tr. 32:8-35:14.

[23] JX 26; JX33.

Willows would bring equipment on the Property,[24] which Mast agreed to provide to Gibbs.[25]

On February 15, 2018, however, Mrs. Gibbs wrote to Pritzkur and Mast's attorney purporting to "totally revoke any permission" that may have been given for Twin Willows or Mast, or his agents, to have access to the Property.[26] After contacting Gibbs, on February 21, 2018, Pritzkur told Mast that Gibbs was agreeable to going back to 48 hours' advance written notice prior to entry on the Property, but wanted a waiver/indemnification letter from Mast before anyone accessed the Property.[27] Pritzkur followed up with a letter to Gibbs indicating that the waiver/indemnification letter was being prepared and advising that Twin Willows' agents would not seek access to the Property until she sends a letter revoking her February 15, 2018 letter.[28] In an April 2, 2018 email to Mast and others, Pritzkur discussed that Mast's attorney was finalizing an indemnification/waiver letter for all owners of the Property and that, once Gibbs received that letter, he did not "necessarily have reason to believe" that she would interfere with Twin Willows'

---

[24] JX34.

[25] JX36.

[26] JX37; JX38. Following receipt of this letter, Pritzkur called Gibbs, and she verbally retracted the statements in the letter. Pritzkur Dep. Tr. 186:19-22; JX39.

[27] JX39.

[28] JX41. On March 23, 2018, Pritzkur sent a letter to Gibbs seeking the letter revoking her February 15, 2018 letter. JX42.

agents.[29]  It appears that the indemnification/waiver was forwarded to Pritzkur from Mast's attorney on April 18, 2018 and, on May 3, 2018, Pritzkur requested that Mast's attorney send the indemnification/waiver directly to Gibbs and also two weeks' notice for when Mast intends to access the Property."[30]  On May 15, 2018, Pritzkur asked that Mast let him know "about his progress with getting onto the [P]roperty, clearing away debris, etc.," and for a timeline of steps to be taken to obtain the Approvals.[31]

On May 22, 2018, Mast provided a timeline for obtaining the Approvals, which indicated that it would take an additional 2+ years to obtain the Approvals, if no issues arose.[32]  Mast's attorney advised Pritzkur that Twin Willows' agents had begun to access the Property around the end of May of 2018.[33]  On July 3, 2018, Geo-Technology Associates ("GTA"), a sister company to MRA, submitted a

---

[29] JX45.  It appears Mast sent an indemnification letter to Gibbs on March 23, 2018. JX43.

[30] JX46; JX47.  In a May 2, 2018 email to Mast's attorney, Pritzkur stated, "[it has] been a while since we've had any communication about the Buyer's access to the Property." D.I. 106, Ex. CC.

[31] JX51.

[32] JX53.  The timeline listed a topographical survey (30-45 days); wetlands delineation (approximately two months); followed by a traffic study and the permitting process for an entrance onto Route 13 ("minimum of two years is anticipated"); and a sewer capacity study ("in tandem with the above items"). *Id.*  At that time, Pritzkur was concerned about Twin Willows' ability to obtain the Approvals by the closing date. JX52.

[33] JX55.

proposal to Mast for an environmental site assessment, wetland delineation, wetland delineation report and plan of the Property.[34] On July 9, 2018, MRA submitted a proposal to Mast for a boundary survey of the Property.[35]

Mast's attorney contacted Pritzkur on July 30, 2018 complaining that Gibbs was "sometimes helpful and then very disruptive as she [was] being currently."[36] On July 31, 2018, Pritzkur responded by email reiterating that Twin Willows needs to comply with the Notice Condition (send 72 hours' written notice to him), copying Gibbs, prior to accessing the Property.[37] He also requested proof of insurance coverage as specified in the Agreement, which was provided on or about August 6, 2018.[38] On August 1, 2018, Mast gave notice to Pritzkur and Gibbs that his agents would be doing work on the Property (cutting and clearing underbrush) between August 6, 2018 and August 19, 2018.[39] On August 6, 2018, Pritzkur emailed Mast

---

[34] JX57. The proposal was submitted to Bay Developers, LLC, which is another limited liability company that Mast owns. Mast Dep. Tr. 47:22-48:16.

[35] JX58.

[36] JX59.

[37] JX60.

[38] *Id.*; Trial Tr. 459:14-21. The insurance coverage period was April 10, 2018 to April 10, 2019. *Id.* 477:13-24; JX244. No proof of insurance was provided showing coverage after April 10, 2019. Trial Tr. 459:22-460:5.

[39] JX64. Although the Agreement required only that advance notice be sent to Pritzkur and Lawrence Respondents' attorney, Pritzkur worked with Mast to ensure that notice was also sent to Gibbs, without objection from Mast. Pritzkur Dep. Tr. 170:24-174:22; Mast Dep. Tr. 52:3-53:12; JX60; *see also* Agreement, art. 11.

advising that his representative will accompany Twin Willows' agents onto the Property and reiterated that he will arrange for a police escort if needed.[40] On August 16, 2018, Mast sent notice to Pritzkur that Twin Willows' agents would be doing a topographical survey on the Property from September 10, 2018 until September 30, 2018.[41] In September and October 2018, MRA and GTA employees were performing work on the Property related to topographical and boundary surveys, and environmental studies.[42]

A major incident occurred on November 2, 2018, in which MRA employees reported to police that Gibbs and her daughter kicked them off of the Property and her daughter took a MRA field notebook, which the police returned.[43] On November 13, 2018, MRA indicated to Mast that they would "not be able to continue working [at the Property] without some sort of chaperon[e] or security personnel."[44] On

---

[40] JX67.

[41] JX68.

[42] *See* JX71; JX72; JX73; JX231, ¶ 13(b) (description of incident between a GTA employee and Gibbs on October 17, 2018).

[43] *See* JX75; JX76; Trial Tr. 23:24-25:8; *id.* 42:19-44:19. There is no evidence that Twin Willows provided advance notice of this entry to Pritzkur. At trial, a MRA employee reported that Gibbs' daughter "touched" their equipment but did not damage it. Trial Tr. 25:13-18; *id.* 33:12-22. A MRA employee testified that he did not feel threatened by the interaction with Gibbs and her daughter but they "wanted [them] to leave." *Id.* 44:20-45:3. *But see id.* 26:17-20 (another MRA employee testified that Gibbs' daughter made him feel "very uncomfortable").

[44] JX80. The MRA internal email also indicated that "[t]he other days we worked [on the Property] they did not have any significant encounters." JX79.

November 16, 2018, Pritzkur responded that his representative "will make certain to have a state trooper or troopers present so that the work that needs to be done can be done without interference by [Gibbs]."[45] On December 11, 2018, Mast emailed Pritzkur that MRA employees would be on the Property on January 7-11, 2019.[46] Pritzkur responded that Mast needed to put this notice in writing to him, copying Gibbs.[47] Although written notice was not sent until later,[48] Pritzkur's representative, after receiving confirmation of the dates onsite on January 7, 2019, arranged for a police escort for MRA's employees from January 8-10, 2019.[49]

On or about December 5, 2018, GTA produced an environmental site assessment in which it recommended that former orchard and plant nursery areas on the Property be evaluated for residual pesticides.[50] On January 9, 2019, Mast engaged GTA for soil sampling to evaluate for "priority pollutant pesticides."[51]

---

[45] JX82. On November 19, 2018, Mast sent notice to Pritzkur, copying Gibbs, that Twin Willows' agents will be on the Property to survey between December 1, 2018 and December 15, 2018. JX 83. It is unclear if any agents were on the Property during that time and no evidence that any issues arose then.

[46] JX85.

[47] *Id.*

[48] On January 8, 2019, Mast sent written notice than MRA will be onsite January 7-21, 2019. JX83.

[49] JX87; JX88; Pritzkur Dep. Tr. 226:12-16.

[50] JX84, §6.2.

[51] JX95.

GTA completed their evaluation on January 28, 2019, which indicated that those pesticides were within allowable limits.[52]

On January 9, 2019, MRA estimated to Mast that their work on the Property would take at least another 20-30 months (which would exceed the Agreement's time period).[53] At that point, "Twin Willows' focus changed."[54] Mast sent written notices to Pritzkur that no one would be onsite, due to weather, between January 21, 2019 and February 18, 2019.[55] When MRA contacted Mast on or about February 5, 2019 asking to go onsite to complete the one-half day of additional field work needed, he indicated that two weeks' notice was needed to go onsite.[56] On February 18, 2019, Mast sent written notice to Pritzkur that, due to weather, no one would be onsite between February 18, 2019 and March 4, 2019.[57] When MRA followed up with Mast on February 21, 2019, asking whether Mast had obtained permission for MRA to go on the Property, Mast responded that MRA should "hold off [until] I

---

[52] JX99, at 2; *see also* JX96. Mast testified that he wanted additional soil borings to further evaluate the arsenic levels, although there is no evidence he took steps to complete those borings. *See* Trial Tr. 365:22-23; *id.* 376:8-11; *id.*, 380:15-18.

[53] JX92. This timeframe assumes that the preliminary process and final engineering occur concurrently; if not, the process was estimated to take 24-36 months. *Id*.

[54] D.I. 157, at 7.

[55] Notices were sent on January 21, 2019 and February 4, 2019. JX83.

[56] JX104.

[57] JX83.

give you the green light."[58]  There is no evidence that Mast ever followed up with MRA to complete their work on the Property.[59]

On or about March 13, 2019, Twin Willows paid $50,000.00 for a six-month extension under the Agreement, extending the Agreement until October 14, 2019.[60] Mast sent written notices stating that Twin Willows was "conducting traffic counts and noise studies" and did not need to go onsite between March 18, 2019 and May 27, 2019.[61]  It appears that the May 13, 2019 notice was the final notice sent by Mast to Pritzkur.[62]

In mid-2019, Mast pursued a possible sale of a portion of the Property to Smyrna School District, which fell through during the summer of 2019.[63]  On or

---

[58] JX108.

[59] Trial Tr. 106:5-11; *id.* 107:9-12.  At trial, Mast testified that MRA told him to "pound sand ... we're done, we ain't coming back." *Id*. 270:20-22; *id*. 263:10-13.  His testimony was contradicted by the testimony of a MRA principal who indicated that MRA would have returned to the job. *Id*. 106:12-21; *id*. 107:9-12 ("[I]s it fair to say you waited for him to give you the green light to finish your work and he never did, right?  [Response:] That's fair.").  Considering all of the evidence, I weigh the testimony of the MRA principal greater than Mast's testimony.

[60] JX119.

[61] JX83.  Notices stating that work would be conducted off the Property for two week periods were sent on March 18, 2019; April 1, 2019; April 15, 2019; April 29, 2019; and May 13, 2019. *Id*.  At his deposition, Mast testified that someone in his office "was just keeping up with the reporting." Mast Dep. Tr. 63:17-21.

[62] *See* JX83.

[63] *See* Trial Tr. 350:19-351:20; JX133; JX135; JX136; JX 137; JX142.  The Property was appraised for the school district for "possible acquisition purposes" at $5,850,000.00, as of May 24, 2019. JX138. It is not clear when or why the sale did not occur.  With regard to why the sale did not occur, Mast testified that "we got into the weeds with [an]

12

about September 11, 2019, Twin Willows paid $50,000.00 for a second six-month extension under the Agreement, extending the Agreement until March 14, 2020.[64] The Twin Willows project "languished."[65] Mast testified that he was not "making any progress with anything else," and did not pursue a traffic impact study.[66] In December of 2019, Mast and Pritzkur started negotiating about extending the Agreement beyond March 14, 2020.[67] On February 28, 2020, Mast signed a listing agreement with R&R Commercial Realty to sell the Property for $7,300,000.00.[68]

## II.    PROCEDURAL HISTORY

On March 13, 2020, Twin Willows filed the Complaint for Declaratory Judgment and Specific Performance ("Complaint") against Pritzkur (as partition trustee), Lawrence Respondents, and Gibbs, seeking a declaration that the parties have a current, valid, and binding Agreement, an 18 month extension of the

---

archeological study … [t]hen one of the school board members found out what was going on, and they killed the deal." Trial Tr. 352:10-15. *But see* JX209 ("the [P]roperty was in the wrong school development zone").

[64] JX145.

[65] D.I. 157, at 8.

[66] Trial Tr. 288:2-5. Mast testified that the "only thing [he] did with a traffic study … [is use] a private guy that counts for DelDOT." *Id.* 345:10-12. He admitted at trial that the notices he sent stating that a noise and traffic study were being conducted were not true. *Id.* 288:8-14.

[67] JX150; JX152-JX161.

[68] JX163. The realtor who entered into the listing agreement testified that the purpose of listing the Property was to find tenants, such as a "supermarket," to help Mast develop the Property. Trial Tr. 452:7-11.

13

Agreement to complete the contingencies, an order that Lawrence Respondents and Gibbs vacate the Property, damages, and attorneys' fees and costs, based on claims of specific performance and breach of contract as well as "general principles of equity."[69] On April 23, 2020, Pritzkur and Lawrence Respondents filed their answers, in which both agreed that the Agreement should be extended only for the time "reasonably necessary" for Twin Willows to finish what needs to be done to obtain the Approvals.[70] Gibbs was served on June 11, 2020,[71] but did not file an answer.

On September 1, 2020, Twin Willows moved for default judgment against Gibbs, which was opposed by Lawrence Respondents and Pritzkur.[72] Both argued that the remedy Twin Willows seeks is inappropriate and asked the Court to craft a different remedy.[73] At a December 15, 2020 hearing, I declined to grant the motion for default judgment and questioned whether this Court has subject matter jurisdiction over the matter.[74] After briefing, the Court held oral argument on subject

---

[69] D.I. 1.

[70] D.I. 5; D.I. 6.

[71] D.I. 9.

[72] D.I. 16; D.I. 17; D.I. 22.

[73] D.I. 17, at 7-8; D.I. 22; Pritzkur Dep. Tr. 256:12-19.

[74] D.I. 24; MDJ Tr. 21:5-12. I also questioned whether Gibbs was properly a party since she was not a party to the Agreement. MDJ Tr. 20:6-21:4. Nevertheless, I have allowed the Lawrence Respondents and Gibbs to participate in this matter as parties. *See* Trial Tr. 4:6-24.

14

matter jurisdiction on July 8, 2021.[75]  In a July 27, 2021 Final Master's Report

("Subject Matter Jurisdiction Report"), I concluded that this Court has subject matter

jurisdiction over Twin Willows' specific performance claim.[76]  Exceptions were

taken to the Subject Matter Jurisdiction Report, but they were overruled.[77]

Extensive discovery followed, and I addressed several discovery disputes.[78]

Twin Willows filed a January 10, 2022 Motion for Leave to File a Motion for

Summary Judgment, contending that, based upon judicial admissions, there were no

facts in dispute and that it could prove entitlement to judgment as a matter of law.[79]

---

[75] D.I. 32; D.I. 33; D.I. 34; D.I. 35; D.I. 36; D.I. 37.  Briefing was delayed to allow time for the parties to negotiate. MDJ Tr. 21:8-12; D.I. 29; D.I. 30.

[76] D.I. 38, at 12.  I also found that the Complaint's request for relief under the "general principles of equity" failed to state a cognizable equitable claim. *Id.*, at 7-8.

[77] D.I. 40; D.I. 64; D.I. 70.

[78]  On November 16, 2021, Twin Willows filed a Joint Motion to Modify a Subpoena and for a Protective Order, arguing that it did not have to produce tax information for Mast and related entities. D.I. 72.  On December 17, 2021, I issued an oral final master's report granting in part and denying in part that motion, holding that the tax returns were relevant and discoverable but requiring that they be produced subject to a confidentiality stipulation, and stayed exceptions to that report. D.I. 81; D.I. 87.  On December 28, 2021, Lawrence Respondents filed a Motion for Protective Order, arguing that they had no discoverable information and did not have to sit for depositions. D.I. 86.  On January 13, 2022, I denied in part, and granted in part, that motion in an oral final master's report, holding that Twin Willows had the ability to depose Lawrence Respondents with limitations, and stayed exceptions to that report. D.I. 92; D.I. 93; D.I. 96.  Upon an emergency request of the parties, on January 20, 2022, I resolved issues that arose during Pritzkur's deposition. D.I. 95; D.I. 98.  On February 3, 2022, Twin Willows filed a Motion to Compel Production of Communications between Lawrence Respondents' attorney and Pritzkur. D.I. 99. Following oral argument on February 18, 2022, I issued a written final master's report on February 28, 2022, granting that motion in part and denying it in part, and stayed exceptions on that report. D.I. 120; D.I. 127; D.I. 129.

[79] D.I. 90.

In a January 12, 2022 order, I denied that request because the scheduling order would not allow full briefing on a summary judgment motion before trial and, preliminarily, it appears that material factual disputes still remain.[80] Pre-trial briefs were submitted on March 9, 2022, and the pre-trial conference in this matter was held on March 15, 2022.[81] On March 21, 2022, Twin Willows filed a Motion to Seal Certain Financial Information and Specify Confidential Treatment.[82] At the beginning of trial on March 23, 2022, I granted that motion in part, holding that the public did not have a strong interest in Mast's detailed financial tax information and sealing trial exhibits and any portion of the trial transcript that addresses that sensitive information.[83] Trial was held on March 23, 2022 and March 24, 2022.[84] Mrs. Gibbs appeared at

---

[80] D.I. 91. The denial was without prejudice and Twin Willows was free to advance its arguments at trial. *Id*., at 4. Under Court of Chancery Rule 143, that order was a final master's report, and I stayed exceptions to that final report. *Id*., at 4-5.

[81] D.I. 134; D.I. 135; D.I. 138; D.I. 143; D.I. 150.

[82] D.I. 144.

[83] Trial Tr. 11:7-16:8. Granular details of Mr. Mast's tax returns and personal financial statements were protected, not high level financial information or cash flow statements, since it appeared that Twin Willows' ability to perform under the Agreement would be an issue at trial. *Id*. 14:4-11; *id*. 13:12-23. As discussed below, this legal issue was not dispositive to my decision in this matter. *See infra* note 169.

[84] D.I. 151. At the beginning of trial, Pritzkur moved to dismiss the matter for lack of standing, citing 6 *Del. C.* § 18-1107(1), because Twin Willows had allowed its corporate charter to lapse in June 2020. Trial Tr. 19:14-20:6. I denied that motion without prejudice in favor of proceeding with trial and allowed Pritzkur to raise that issue in post-trial briefing. *Id*. 22:13-23:13. During the trial, evidence was presented that Twin Willows' charter had been revived *nunc pro tunc*, and Pritzkur withdrew the motion to dismiss at the close of trial. *See id.* 241:16-242:18; *id*. 495:13-17; Demonstrative Ex. 5.

trial, and I allowed her to participate in the proceedings in the same capacity as Lawrence Respondents.[85] The parties submitted post-trial memoranda on April 25, 2022.[86]

## III. ANALYSIS

### A. Judicial Admissions

Twin Willows contends that Pritzkur and Lawrence Respondents made judicial admissions in their answers that are binding and dispositive to this matter.[87] Pritzkur responds that these judicial admissions are not binding because the factual allegations were subsequently established to be false.[88]

"Voluntary and knowing concessions of fact made by a party during judicial proceedings (e.g., statements contained in pleadings, stipulations, depositions, or testimony; responses to requests for admissions; counsel's statements to the court) are termed 'judicial admissions.'"[89] "Judicial admissions which are binding on the tendering party are limited to factual matters in issue and not to statements of legal

---

[85] Trial Tr. 4:6-24.

[86] D.I. 153; D.I. 155; D.I. 157.

[87] D.I. 138, at 11-14; D.I. 131; *see also* D.I. 90.

[88] D.I. 153, at 19-20. Alternatively, Pritzkur argues that judicial admissions are not binding on the Court. *Id.*

[89] *Merritt v. United Parcel Serv.*, 956 A.2d 1196, 1201 (Del. 2008) (citations omitted). *E.g.*, *Feldman v. YIDL Tr.*, 2018 WL 1151797, at *4 (Del. Ch. Mar. 5, 2018); *Pilot Point Owners Ass'n v. Bonk*, 2010 WL 3959570, at *2 (Del. Ch. Oct. 7, 2010).

theories or conceptions."[90]  A judicial admission "is not merely another layer of evidence, upon which the … court can superimpose its own assessment of weight and validity.  It is, to the contrary, an unassailable statement of fact that narrows the triable issues in the case."[91]  "A tribunal may, however, in the exercise of its discretion, relieve a party from the conclusiveness of its judicial admissions."[92]

First, Twin Willows asks the Court to establish as a judicial admission that "Gibbs has made it very difficult for Twin Willows to complete work at the Property in order to complete the permitting processing [sic] specified in the Agreement of Sale" against Pritzkur.[93]  This is a concession of fact made by Pritzkur in his answer and confirmed in deposition and trial testimony.[94]  This is a judicial admission and, considering the circumstances, I find it would be inequitable to relieve Pritzkur of the consequences of that admission.[95]

---

[90] *Blinder, Robinson & Co. v. Bruton*, 552 A.2d 466, 474 (Del. 1989) (citation omitted); *see also AT&T Corp. v. Lillis*, 953 A.2d 241, 257 (Del. 2008) (citation omitted); *Cox Commc'ns, Inc. v. T-Mobile US, Inc.*, 273 A.3d 752, 766 (Del. 2022) ("[The judicial admission] doctrine does not apply to legal conclusions.") (citation omitted), *reargument denied* (Mar. 22, 2022).

[91] *BE&K Eng'g Co. v. RockTenn CP*, 2014 WL 186835, at *7 (Del. Ch. Jan. 15, 2014) (internal quotation marks and citations omitted) (alteration in original), *aff'd sub nom. RockTenn CP v. BE&K Eng'g Co.*, 103 A.3d 512 (Del. 2014) (Mem.); *see also Itron, Inc. v. Consert Inc.*, 109 A.3d 583, 588 (Del. Ch. 2015).

[92] *Merritt*, 956 A.2d at 1202 (citations omitted).

[93] D.I. 138, at 12 (citing D.I. 6, ¶ 29).

[94] *See* D.I. 98; Pritzkur Dep. Tr. 155:10-24; Trial Tr. 161:11-12.

[95] The legal significance of this admission is addressed later. *See infra* notes 160-166 and accompanying text.

18

Next, Twin Willows asks the Court to establish as a judicial admission that "[Twin Willows] was unable to clear the ground for the survey team and that [Gibbs] ran over the surveyors' GPS system," and that "Gibbs barred Twin Willows from the [P]roperty in early 2018."[96] I find that the first statement was not an unequivocal statement as to a matter of fact because Pritzkur's admission in the answer contained a disclaimer – "Trustee was provided information to apparently substantiate this allegation."[97] Further, the trial evidence does not support that statement.[98] Therefore, I decline to establish that statement as a judicial admission. The second statement was an unequivocal statement of fact in Pritzkur's answer, consistent with trial evidence, and is subject to judicial admission.[99]

In addition, Twin Willows asks that the Court find that Pritzkur's and Lawrence Respondents' prayers for relief asking the Court to "[e]xtend the time for [Twin Willows] to complete the contingencies [in] … the Agreement" are judicial admissions.[100] I conclude that the decision whether the Court should extend the

---

[96] D.I. 138, at 12 (citing D.I. 6, ¶¶ 30-31, 34).

[97] D.I. 6, ¶¶ 30-31; *see also* Trial Tr. 161:16-19 ("I had no personal knowledge of what she did … [T]his is the allegation …. And how I answered them is in [my answer].").

[98] *See supra* notes 39-43 and accompanying text. A MRA employee testified at trial that Gibbs' daughter "touched" their equipment but did not damage it. Trial Tr. 25:13-18; *id.* 33:12-22. *See also AT&T Corp. v. Lillis*, 953 A.2d 241, 257 (Del. 2008).

[99] *See* D.I. 6, ¶ 34.

[100] D.I. 138, at 14; *see* D.I. 5, at 17; D.I. 6.

Agreement is a legal conclusion – a litigating position – and it is not subject to judicial admission.[101]

## B. Twin Willows is not Entitled to Specific Performance due to the Agreement's Time is of the Essence Clause

At issue is whether Twin Willows is entitled to specific performance of the Agreement, given the time is of the essence clause in the Agreement. Twin Willows contends that it is entitled to specific performance because Gibbs' interference with Twin Willows' access, which was not properly addressed by Pritzkur, prevented it from performing under the Agreement.[102] Respondents argue, in response, that Twin Willows is in default of material obligations under the Agreement, including the time is of the essence clause, and was not ready, willing and able to perform its obligations under the Agreement.[103]

---

[101] I also consider whether judicial estoppel might apply. Judicial estoppel "prevents a litigant from advancing an argument that contradicts a position previously taken that the court was persuaded to accept as the basis for its ruling." *Motorola Inc. v. Amkor Tech., Inc.*, 958 A.2d 852, 859 (Del. 2008). However, a party "is not barred from changing its position under the doctrine of judicial estoppel [if the] court did not rely on [the party's] argument in a decision." *AT&T Corp. v. Lillis*, 953 A.2d 241, 257 (Del. 2008). Respondents changed their positions long ago (before December 2020), *see* D.I. 17, D.I. 22; D.I. 34; D.I. 51; D.I. 76; D.I. 106; D.I. 134. The Court has not relied on these statements in its decisions, and there is no prejudice in allowing Respondents to change their litigating positions.

[102] D.I. 138, at 4-11.

[103] *See* D.I. 135, at 7-11; D.I. 134, at 20-31; D.I. 155, at 9-15.

"A party seeking specific performance must establish (1) a valid contract exists, (2) he is ready, willing, and able to perform, and (3) that the balance of the equities tips in favor of the party seeking performance."[104] The burden of proof for each element is clear and convincing evidence.[105] "Specific performance will not be granted to a party who is in default of a material obligation under the contract, unless that party is excused from performance of that obligation."[106] Here, the Agreement has a time is of the essence clause.[107] Delaware courts will generally give substantial weight to these provisions, and the presence of a time is of the essence clause usually prohibits the remedy of specific performance if the party fails to meet its contractual obligations within the specified time.[108]

In the Subject Matter Jurisdiction Report, I considered the effect of the Agreement's time is of the essence clause, and concluded that "[t]o obtain specific performance, … Twin Willows will have to prove [Respondents'] misconduct, that their actions prevented Twin Willows from performing under the contract, and that

---

[104] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1158 (Del. 2010).

[105] *Id.*

[106] *Walton v. Beale*, 2006 WL 4763946, at *3 (Del. Ch. Jan. 30, 2006).

[107] Agreement, art. 10.

[108] *See Penden v. Gray*, 886 A.2d 1278, 2005 WL 2622746, at *3 (Del. Oct. 14, 2005) (TABLE); *see also HIFN, Inc. v. Intel Corp.*, 2007 WL 1309376, at *9 (Del. Ch. May 2, 2007) ("When time is of the essence in a contract, a failure to perform by the time stated is a material breach of the contract.") (citation omitted).

it could have performed under the Agreement on a timely basis if the alleged misconduct had not occurred."[109] With the advantage of the trial record, I return to the question of whether Twin Willows has proven it is entitled to specific performance, and also address Twin Willows' argument about post-contractual modification of the Notice Condition, and its contention that *Mogavero v. Greenberg*[110] entitles it to relief.

"It is fundamental law that a party seeking a decree for specific performance of a contract must, himself, have performed within the time specified [for] his own obligations under the contract."[111] Where there is a time is of the essence clause, "the surrounding circumstances are ordinarily immaterial in excusing the [party's] delay in tendering performance on or before the specified date."[112] "It is, however, equally fundamental that a failure of a plaintiff to have performed his own obligation will be excused if he was prevented by the other party from performing his obligation."[113] "Where time is of the essence, the plaintiff must have performed

---

[109] D.I. 38, at 12; *see also* D.I. 70, 11:12-19.

[110] 2007 WL 2713843 (Del. Ch. Sept. 12, 2007).

[111] *Wells v. Lee Builders, Inc.*, 99 A.2d 620, 621 (Del. 1953) (citations omitted).

[112] *Charamella v. Barley Mill Road Homes, Inc.*, 142 A.2d 515, 517 (Del. Ch. 1958) (citation omitted); *see also Thompson v. Burke*, 1985 WL 165736, at *3 (Del. Ch. June 7, 1985).

[113] *Wells*, 99 A.2d at 621 (citations omitted). *See also T.B. Cartmell Paint & Glass Co. v. Cartmell*, 186 A. 897, 903 (Del. Super. 1936) ("It is a sound principle that he who prevents a thing being done shall not avail himself of the non-performance that he has occasioned.") (internal quotation marks and citations omitted).

22

those obligations within the specified time, unless prevented from doing so by the defendant."[114]

Under the prevention doctrine, a party's duty to perform a condition of a contract is excused if the other party's actions contributed materially to the non-occurrence of the condition.[115] "It is an established principle of contract law that '[w]here a party's breach by non-performance contributes materially to the non-occurrence of a condition of one of his duties, the non-occurrence is excused.'"[116] The non-performance must be material.[117] "A breach 'contributed materially' to the

---

[114] *Thompson*, 1985 WL 165736, at *3 (citing *Wells*, 99 A.2d 620).

[115] *See Snow Phipps Grp., LLC v. KCake Acquisition, Inc.*, 2021 WL 1714202, at *52-56 (Del. Ch. Apr. 30, 2021); *Neurvana Med., LLC v. Balt USA, LLC*, 2020 WL 949917, at *19 (Del. Ch. Feb. 27, 2020) ("The prevention doctrine provides that a party may not escape contractual liability by reliance upon the failure of a condition precedent where the party wrongfully prevented performance of that condition precedent.") (citing *Mobile Commc'ns Corp. of Am. v. MCI Commc'ns Corp*, 1985 WL 11574, at *4 (Del. Ch. Aug. 27, 1985)); *Seven Invs., LLC v. AD Cap., LLC*, 32 A.3d 391, 400 (Del. Ch. 2011). However, if the condition would not have occurred regardless of the other party's actions, the prevention doctrine does not apply. *See Snow Phipps Grp.*, 2021 WL 1714202, at *52 (citation omitted).

[116] *WaveDivision Hldgs., LLC v. Millennium Digital Media Sys., LLC*, 2010 WL 3706624, at *14 (Del. Ch. Sept. 17, 2010) (quoting Restatement (Second) of Contracts § 245).

[117] *Snow Phipps Grp.*, 2021 WL 1714202, at *52 (citation omitted); *id.* ("[To be material,] it is not necessary to show that the condition would have occurred but for the lack of cooperation." (quoting *In re Anthem-Cigna Merger Litig.*, 2020 WL 5106556, at *91 (Del. Ch. Aug. 31, 2020)).

23

non-occurrence of a condition if the conduct made satisfaction of the condition less likely."[118]

To determine whether there was misconduct by Respondents that prevented Twin Willows from performing its obligations under the Agreement, it is necessary to understand the parties' obligations under the Agreement.

1. Parties' Obligations under the Agreement[119]

Twin Willows was obligated under the Agreement to pay Pritzkur $3,276,000.00 no later than 30 days after the expiration of the Permitting Period ("Closing Obligation"),[120] to pursue the Approvals, and to provide quarterly written status updates to Seller in the 24 months following the Due Diligence Period.[121] Twin Willows' Closing Obligation was not conditioned upon actually obtaining the Approvals. The Agreement states that "Buyer's obligations are expressly

---

[118] *Id.* (quoting *Anthem-Cigna*, 2020 WL 5106556, at *91) (internal quotation marks omitted). The Court does not, within this analysis, consider whether the parties acted in subjective bad faith. *Id.*, at *53.

[119] In addition to the obligations addressed below, Buyer and Seller had other obligations under the Agreement that are not at issue here. *See* Agreement, art. 3(a) (Buyer's obligation to evaluate to its satisfaction "the soil types, water table, and other requirements" of the Property during the Due Diligence Period); *id.*, art. 6 (mutual obligations of Buyer and Seller to pay applicable transfer taxes and pr-rated charges); *id.* art. 9(a) (Seller covenanted that it had the authority to sell the Property); *id.*, art. 3(d) (Seller's obligation to seek immediate approval of the Agreement from this Court).

[120] *Id.*, arts. 1, 2(a), 4(a). It could elect to close earlier upon obtaining the Approvals or providing 15-days written notice to Seller. *Id.*, art. 4(a).

[121] *Id.*, art. 3(b).

24

conditioned upon [a Due Diligence Period and a Permitting Period], the satisfaction of which may be waived by Buyer."[122]  Buyer was obligated to use good faith, diligent efforts to seek the Approvals; however, it could waive the Approvals and proceed to settlement, or terminate the Agreement and walk away.[123]

In addition, Twin Willows was obligated to use "good faith, diligent efforts" to pursue the Approvals during the Permitting Period.[124]  The Agreement does not define "good faith, diligent efforts."  If a contractual term is undefined, "the interpreting court may consult the dictionary, if that is deemed useful, when determining the term's plain meaning."[125] Based on dictionary definitions, Twin Willows had an obligation to make a steady, earnest, energetic, honest, and lawful exertion of power to obtain the Approvals.[126]  Thus, Twin Willows was not under an

---

[122] *Id*., art. 3.

[123] *Id*., art. 3(b); *see id.* art. 4(b) ("[I]f Buyer … determines in good faith that one or more of the contingencies cannot be satisfied and will not be waived, and provided Buyer shall have used good faith, diligent efforts to satisfy all contingencies, Buyer shall have the option to cancel this Agreement.").

[124] *Id.*, art. 3(b); *see id.*, 4(b) ("… provided Buyer shall have used good faith, diligent efforts to satisfy all contingencies").

[125] *Wenske v. Blue Bell Creameries, Inc.*, 2018 WL 3337531, at *10 (Del. Ch. July 6, 2018), *reargument denied,* 2018 WL 5994971 (Del. Ch. Nov. 13, 2018); *see also Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 738 (Del. 2006).

[126] *See Diligent*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/diligent (last accessed August 1, 2022) ("characterized by steady, earnest, and energetic effort"); *Good Faith*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/good%20faith (last accessed August 1, 2022) ("honesty and lawfulness of purpose"); *Effort*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/effort (last accessed August 1, 2022) ("conscious exertion of

absolute duty to obtain the Approvals, but it had a heightened obligation to pursue them.

Pritzkur was obligated under the Agreement to convey marketable title to the Property by special warranty deed to Buyer at closing,[127] and to permit Buyer to enter onto the Property ("Access Rights") during the Due Diligence and Permitting Periods.[128] The Access Rights, however, were expressly conditioned upon the following: 1) Buyer must provide 72 hours' "notice of each intended entry"; 2) Buyer must afford Seller the opportunity to accompany Buyer onto the Property; 3)

---

power"). This Court has considered language requiring "due diligence and good faith efforts" as similar to the "best efforts" standards. *See W. Willow-Bay Ct., LLC v. Robino-Bay Ct. Plaza, LLC*, 2007 WL 3317551, at \*8, 11 n. 93 (Del. Ch. Nov. 2, 2007), *aff'd,* 985 A.2d 391 (Del. 2009), *as corrected* (Nov. 30, 2009). This Court has considered that the "best efforts" standard "requir[es] a party to do essentially everything in its power to fulfill its obligation." *AB Stable VIII LLC v. Maps Hotels & Resorts One LLC*, 2020 WL 7024929, at \*91 (Del. Ch. Nov. 30, 2020), *judgment entered,* (Del. Ch. 2021), and *aff'd,* 268 A.3d 198 (Del. 2021) And, considering "good faith efforts" and "diligent efforts" separately, the "good faith efforts" standard has been considered in the context of a corporate merger & acquisition as "requir[ing] honesty in fact and the observance of reasonable commercial standards of fair dealing." *AB Stable VIII LLC v. Maps Hotels & Resorts One LLC*, 2020 WL 7024929, at \*91 (Del. Ch. Nov. 30, 2020), *judgment entered*, 2021 WL 46242 (Del. Ch. Feb. 5, 2021), *aff'd*, 268 A.3d 198 (Del. 2021) (citations omitted). Although I found no caselaw addressing the separate "diligent efforts" standard (if not contractually defined), it appears the "diligent efforts" standard is a higher standard, similar to "best efforts" and "reasonable efforts." *See* Ryan Aaron Salem, Comment, *An Effort to Untangle Efforts Standards Under Delaware Law*, 122 Penn St. L. Rev. 793, 803 (2018); *Menn v. ConMed Corp.*, 2022 WL 2387802, at \*34-35 (Del. Ch. June 30, 2022); *see also AB Stable VIII LLC*, 2020 WL 7024929, at \*91 (discussing that "reasonable efforts" require taking of typical actions under the circumstances).

[127] Agreement, arts. 1, 5, 7.

[128] *Id.*, art. 3(a).

Buyer must use good faith, diligent efforts to minimize the disruption to any occupant's use of the Property during its entry onto the Property; 4) Buyer must provide Seller with evidence of adequate insurance to cover risks associated with Buyer's activities; 5) Buyer must restore any damage to the Property; and 6) Buyer must indemnify and hold Seller harmless from any loss, cost, claim, liability, or damage resulting from its entry onto the Property (collectively, "Conditions").[129]

Twin Willows argues that Pritzkur's "job was to facilitate access for whatever work, if any, that [Twin Willows] wanted to do."[130] I agree that Pritzkur had the duty to take reasonable efforts to permit Twin Willows' access onto the Property.[131] However, that duty was expressly conditioned upon Twin Willows fulfilling the Conditions, so it did not arise until Twin Willows satisfied the Conditions.

---

[129] *Id.*

[130] D.I. 157, at 3.

[131] Here, the Agreement placed no express obligation on Pritzkur to cooperate with Twin Willows' efforts to obtain the Approvals. *Compare Mogavero v. Greenberg*, 2007 WL 2713843, at *6 (Del. Ch. Sept. 12, 2007) (an express contractual duty to cooperate is a heightened obligation over the implied covenant of good faith and fair dealing). Some reasonable duty under the implied covenant of good faith and fair dealing, consistent with Pritzkur's conditional obligation to provide the Access Rights, would be implied. *See Glaxo Grp. Ltd. v. DRIT LP*, 248 A.3d 911, 919 (Del. 2021) (holding that, under Delaware law, the implied covenant of good faith inheres in every contract.").

2. <u>Respondents' Conduct did not Prevent Twin Willows from Performing its Obligations</u>

Twin Willows contends that it "suffered from repeated interruptions to its permitting process, and it was not Twin Willow's responsibility to solve these problems."[132] It argues that Pritzkur's demands and Gibbs' interference resulted to a breach of the Access Rights, preventing Twin Willows from obtaining the Approvals and closing on the Property.[133] Pritzkur responds that, because Twin Willows breached the Agreement's terms, including by failing to diligently pursue the Approvals or to satisfy the Notice Condition, the time is of the essence clause in the Agreement prevents specific performance.[134] Similarly, Lawrence Respondents argue that Respondents did not breach the duty to provide Access Rights since Twin Willows did not provide the required 72 hours" notice to activate those Rights.[135]

The issue is whether Pritzkur, as a result of Gibbs' actions, interfered with Twin Willows' Access Rights and pursuit of the Approvals such that Twin Willows was prevented from fulfilling its obligations under the Agreement. If that interference prevented Twin Willows from performing its obligations under the

---

[132] D.I. 138, at 18.

[133] D.I. 157, at 4-6; D.I. 138, 4-9, 19.

[134] D.I. 153, at 5-14; D.I. 134, at 24-33. Pritzkur also argues that Twin Willows delayed in providing proof of insurance and indemnification, which were pre-conditions for Pritzkur to provide the Access Rights. D.I. 153, at 11.

[135] D.I. 155, at 9-11. The Lawrence Respondents also assert that Twin Willows breached the Agreement by failing to provide quarterly status reports. *Id.*, at 11-12.

Agreement, Twin Willows may be entitled to specific performance, despite the time is of the essence clause.

After assuming the Agreement in March 2017, Twin Willows initially took limited action pursing the Approvals.[136]  It engaged MRA on August 17, 2017 to provide concept planning services.[137]  It began accessing the Property around that time but the evidence does not show it complied with the Notice Condition prior to entry.[138]  On October 27, 2017, Mast and Pritzkur discussed Twin Willows' access to the Property and Pritzkur asked that Mast provide 2-3 weeks' notice before entering onto the Property (and offered to arrange for a police escort if needed).[139] In December 2017, Twin Willows' representatives continued to go onto the Property with Gibbs' (not Pritzkur's) permission.[140]  During that time, because Twin Willows failed to comply with the Notice Condition, any impediment caused by Gibbs does not represent a denial of the Access Rights, or a breach under the Agreement, by Pritzkur.

---

[136] When Twin Willows assumed the Agreement, it knew that the Due Diligence Period had run. Trial Tr. 382:23-383:17.  Nothing in the record indicates that JMW completed any tasks or did any work on the Property prior to Twin Willows assuming the Agreement.

[137] JX20.

[138] *See* Mast Dep Tr. 23:21-24:11; Trial Tr. 470:12-17.

[139] JX23.

[140] *See supra* note 22.

In mid-February 2018, Gibbs purported to revoke Twin Willows' access to the Property, but Pritzkur arranged for restoration of access once Twin Willows provided an indemnification/waiver letter, and 48 hours' advance written notice.[141] On April 2, 2018, Pritzkur wrote Mast that he could resume accessing the Property.[142] Twin Willows' Access Rights were halted for approximately two months. After being told that it could return to the Property in early April, Twin Willows did not access the Property again until late May 2018, and Twin Willows did not begin working with MRA and GTA on proposals for survey, engineering, and environmental work until July 2018.[143]

It appears difficulties arose with Gibbs in July 2018 and Pritzkur told Twin Willows to provide 72 hours' written notice to him, copying Gibbs.[144] When Mast provided advance notice to Pritzkur about access for August and September 2018, it appears Twin Willows' agents performed work on the Property without incident.[145] There was a major incident between Gibbs and MRA employees on November 2,

---

[141] The fact that Gibbs barred Twin Willows from the Property was a judicial admission. *See supra* note 99. Indemnification was one of the Conditions, along with the Notice Condition. *See* Agreement, art. 3(a).

[142] JX45. It is not clear when Twin Willows provided the indemnification/waiver. It appears issues continued through April of 2018, although an indemnification/waiver was sent to Gibbs on March 23, 2018. *See supra* notes 28-30.

[143] *See* JX55; JX57; JX58; D.I. 106, Ex. CC.

[144] He also requested proof of insurance, which is one of the Conditions. JX60; *see* Agreement, art. 3(a).

[145] JX64; JX67; JX68.

2018, but there is no evidence that advance notice was given to Pritzkur prior to that entry.[146] Upon learning of the November 2, 2018 incident, Pritzkur responded that a police escort will be arranged if advance notice is provided, which occurred for Twin Willows' next entry onto the Property in January 2019.[147] In February 2019, Twin Willows' plans for the Property changed, and it appears Twin Willows stopped pursuing the Approvals.[148] Twin Willows paid for two extensions to the Permitting Period,[149] but did not seek access to perform work on the Property after March 2019.[150]

Twin Willows never completed the preliminary approvals process, and Mast testified that "[i]t's a huge sum of money," and an involved and long process.[151] To obtain preliminary plan approval, Mast would need to have completed (1) a traffic impact study reviewed and approved by DelDOT, (2) a very detailed preliminary plan, (3) a topographical study, and (4) a boundary survey, and (5) an accurate

---

[146] *See supra* note 43 and accompanying text.

[147] JX82; JX85; JX87; JX88.

[148] *See supra* notes 54-59, 65-66 and accompanying text.

[149] *See* JX114; JX145.

[150] *See supra* note 61 and accompanying text.

[151] Mast Dep. Tr. 40:10-13; *see* Trial Tr. 66:23-67:15; *id.* 262:6-14 ("[T]here's probably 30 steps, 40 steps, I don't know how many steps, in order to get a project like this from Point A to Point B. And honestly, we were, I don't know, we're a step – I don't know what step we were in …").

delineation of wetlands.[152] Rezoning also would have been required for Twin Willows' project on the Property.[153]

By February 2019, MRA had completed a conceptual study, a boundary survey and "95 percent [of] the topographic survey [and] were in the process of locating ... wetland flags."[154] GTA had "completed a wetland delineation of the [P]roperty" and were close to three-quarters done on the wetland delineation report and plan.[155] A Phase I environmental study had been completed.[156] But, substantial additional time and work was required to obtain the Approvals, since little work had been performed on the traffic study (it was estimated to take a minimum of two years to complete a traffic study and the permitting process for the Property).[157] And, Mast wanted additional soil borings for arsenic levels on the Property but took no steps to obtain the borings.[158]

---

[152] Trial Tr. 69:11-21.

[153] *Id*. 115:3-10.

[154] *See id*. 59:2-6; *id.* 343:2-8.

[155] *Id*. 59:8-10; *see* JX91 (GTA October 15, 2018 invoice showing GTA had completed 100% of Wetland Delineation); JX116 (GTA March 13, 2019 invoice showing GTA had completed 72.72% of the Wetland Delineation Report & Plan).

[156] *See* Trial Tr. 71:15-16; JX84; JX72.

[157] *See* Mast Dep. Tr. 42:4-12 (Twin Willows only held preliminary meetings with Kent Conservation District); *see also* JX92; JX100; MDJ Tr. 5:4-6 ("As [of December 15, 2020], ... the process necessary to close is about half completed.").

[158] Trial Tr. 365:22-23; *id.* 376:8-11; *id.*, 380:15-18.

Twin Willows' limited efforts do not support that it diligently – with a heightened obligation – pursued the Approvals.[159]  Further, the evidence does not show that Pritzkur's or Gibbs' conduct prevented Twin Willows from fulfilling its obligations under the Agreement.   It is judicially admitted that "Gibbs has made it very difficult for Twin Willows to complete work at the Property in order to complete the permitting process specified in the Agreement of Sale."[160]  There were incidents with Gibbs that impeded Twin Willows' access to the Property at times.  However, the evidence shows that those incidents occurred when Twin Willows had not complied with the Notice Condition.[161]  Pritzkur, in response to concerns about Gibbs' conduct, repeatedly offered to provide a police escort to prevent problems or interference with Twin Willows' Access Rights.[162]  Twin Willows asserts that providing a police escort was not efficient, given that contractors' plans change at

---

[159] Over the course of three years, it appears Twin Willows actively took steps to pursue the Approvals for approximately seven months (July 2018 to January 2019), was barred from the Property for approximately two months (February 2018 to April 2018), and made limited efforts otherwise in pursuit of the Approvals. *See supra* notes 16-68 and accompanying text.

[160] *See supra* notes 93-95 and accompanying text.

[161] Twin Willows specifically points to the November 2, 2018 incident as a denial of the Access Rights. D.I. 138, at 7-10.  But since Twin Willows failed to comply with the Notice Condition for that entry onto the Property, it did not meet the Conditions, and its Access Rights were not breached.  *See supra* note 43 and accompanying text.

[162] *See, e.g.*, JX23; JX67.

33

the last minute.[163]  However, Twin Willows was obligated to provide 72 hours' advance notice before entering the Property, so last-minute changes would have implicated that Condition as well.  Pritzkur offered to arrange for a police escort whenever requested, and when the police were present, there were no issues with access to the Property.[164]  Without advance notice, Pritzkur was unaware that Twin Willows' agents were going onto the Property and had no opportunity to work with Gibbs in advance to prevent problems, or to accompany the agents onto the Property to address problems that might arise.[165]

Although Gibbs' actions may have contributed to Twin Willows' difficulties, considering all of the circumstances, I do not find that Respondents' actions, and particularly Pritzkur's actions (as Seller), prevented Twin Willows from performing under the Agreement.[166]  When provided advance notice, Pritzkur permitted access and addressed access issues, consistent with any obligations he had under the implied covenant of good faith and fair dealings.  In contrast, Twin Willows did not meet its obligation to pursue the Approvals with good faith, diligent efforts.  Its

---

[163] Trial Tr. 270:7-19 (Mast's testimony that hiring state troopers as security "was the probably the dumbest setup ever").

[164] *See id.* 94:19-22.

[165] D.I. 106, Ex. CC (December 21, 2017 letter from Pritzker to Mast).

[166] And, with regard to the prevention doctrine, I consider that the Closing Obligation was not actually conditioned upon obtaining the Approvals, so there was not failure of a condition precedent. *See supra* notes 115-118, 122 and accompanying text.

efforts were lackadaisical at best and left much to be accomplished in order to obtain the Approvals, without the time available under the Agreement to do so.[167] Thus, Twin Willows' failure to perform under the Agreement would have occurred regardless of Pritzkur's or Gibbs' actions. Because I find that Respondents' actions did not prevent Twin Willows from performing under the Agreement, Twin Willows defaulted on a material obligation in the Agreement when time remained of the essence and it failed to close on the date specified in the Agreement, or by April 14, 2020.[168] Therefore, Twin Willows has not shown by clear and convincing evidence that there are on-going obligations under the Agreement that can be specifically enforced, and Twin Willows is not entitled to specific performance.[169]

3. Notice Condition was Not Modified by Waiver, Estoppel or Acquiescence

Twin Willows argues that waiver, estoppel, or acquiescence apply to modify the Notice Condition in the Agreement.[170] Twin Willows first argues that Pritzkur

---

[167] *See supra* notes 157-158.

[168] Since the extended Permitting Period ended on March 14, 2020, the outside date for closing under the Agreement was April 14, 2020. *See* Agreement, art. 4(a).

[169] The Agreement allocated the risk of not obtaining the Approvals to Buyer since Buyer could proceed to settlement or terminate, regardless of whether it obtained the Approvals. *See id.*, arts. 3(b), 4(b). Because I find Twin Willows' materially defaulted on other grounds, I do not address Pritzkur's argument regarding Twin Willows' financial ability to close by the outside date specified in the Agreement. *See* D.I. 153, at 17-18.

[170] D.I. 157, at 13-20. Twin Willows also claims that the obligation in the Agreement that it provide quarterly written status reports was either waived or modified. *Id.*, at 12, 16-17. I do not address that issue since I do not rely on any alleged breach by Twin Willows with regard to that requirement in my decision. In addition, the Agreement contains an anti-waiver provision. Agreement, art. 13(d). "Delaware law recognizes [and enforces] the

waived the Notice Condition by choosing not to act when Twin Willows did not comply with the Notice Condition.[171] "[Although] contractual requirements or conditions may be waived, … the standards for proving waiver under Delaware law are 'quite exacting.'"[172] "A party asserting waiver must demonstrate that (1) there is a requirement or condition to be waived; (2) the waiving party knew of the requirement or condition; and (3) the waiving party intended to waive that requirement or condition."[173] "The facts relied upon to prove waiver must be unequivocal."[174]

Here, Pritzkur brought up the requirement that Twin Willows comply with the Notice Condition repeatedly over the course of the Agreement.[175] Although Twin

---

important policy considerations underlying … anti-waiver provisions, … [b]ut when applied to post-contract behavior, these principles do not prohibit the Court's consideration of subsequent promises, communications, or modifications to the express agreement." *In re Coinmint, LLC*, 261 A.3d 867, 896-97 (Del. Ch. 2021) (citations omitted). Therefore, I consider Twin Willows' arguments concerning post-contract behavior.

[171] D.I. 157, at 15-16.

[172] *AeroGlobal Cap. Mgmt., LLC v. Cirrus Indus., Inc.*, 871 A.2d 428, 444 (Del. 2005) (citation omitted).

[173] *See Coinmint*, 261 A.3d at 893 (citation omitted).

[174] *Id.* (quoting *AeroGlobal Cap. Mgmt.*, 871 A.2d at 444) (internal quotation marks omitted); *see Simon-Mills II, LLC v. Kan Am USA XVI LP*, 2017 WL 1191061, at *34 (Del. Ch. Mar. 30, 2017); *Dudizak v. Dudizak*, 1975 WL 1251, at *3 (Del. Ch. Aug. 8, 1975).

[175] *E.g.*, JX23; JX45; JX51; JX60; JX61; JX67; JX85. Mast testified that he and Pritzkur spoke regularly on the telephone, suggesting that Pritzkur impliedly agreed to accept notices by telephone. *E.g.*, Trial Tr. 288:19-289:1; *id.* 290:16-24; *id.* 291:21-292:4; *id.* 358:12-18. I am unpersuaded by his testimony since Pritzkur repeatedly requested written notice from Mast before Twin Willows' entry on the Property, and Pritzkur's fees' affidavit shows only infrequent telephonic communication between Mast and Pritzkur. *See* JX148.

36

Willows points to Pritzkur's testimony where Pritzkur indicated that he "[tried] to work things out" with regard to the Agreement,[176] the evidence does not show an "unequivocal" intent to waive the Notice Condition.[177] Indeed, if there was a modification of the Notice Condition it was to expand the requirement – to include a longer advance written notice to Gibbs as well as Pritzkur.[178] Thus, Twin Willows' waiver argument fails.

Next, Twin Willows argues that quasi-estoppel applies and that Pritzkur should be estopped from making "a strategic turn" by invoking the Notice Condition.[179] "Under Delaware law, the doctrine of quasi-estoppel applies 'when it would be unconscionable to allow a person to maintain a position inconsistent with one to which he acquiesced, or from which he accepted a benefit. To constitute this sort of estoppel the act of the party against whom the estoppel is sought must have gained some advantage for himself or produced some disadvantage to another.'"[180]

---

[176] D.I. 157, at 15 (quoting Trial Tr. 467:15-468:1). In that same interaction, Pritzkur reiterated that, even though there was an exchange of phone numbers between Mast and Gibbs, "there was still the requirement of written notice, yes, in the contract." Trial Tr. 466:4-16.

[177] I distinguish the case cited by Twin Willows, *Prizm Grp., Inc. v. Anderson*, 2010 WL 1850729 (Del. Ch. May 10, 2010), to support its argument. Unlike here, the evidence in the *Prizm* case showed that a stockholder "consciously chose not to pursue any action," and cited specific instances in the trial exhibits and the trial transcript. *Id.*, at *6.

[178] *See supra* notes 19, 30, 39, 41 and accompanying text (regarding two weeks' notice).

[179] D.I. 157, at 17-18.

[180] *RBC Cap. Markets, LLC v. Jervis*, 129 A.3d 816, 872-73 (Del. 2015) (quotation omitted).

This theory similarly lacks support from the evidence – Pritzkur repeatedly invoked the Notice Condition. Accordingly, Twin Willows' estoppel argument fails.

In addition, Twin Willows contends that "this is textbook acquiescence."[181] "The doctrine of acquiescence effectively works an estoppel: where a plaintiff has remained silent with knowledge of her rights, and the defendant has knowledge of the plaintiff's silence and relies on that silence to the defendant's detriment, the plaintiff will be estopped from seeking protection of those rights."[182] Twin Willows' theory is that Pritzkur knew of the Notice Condition, knew that Twin Willows was not strictly complying with that condition, failed to act regarding Twin Willows' non-compliance, and asserts the Notice Condition only after Twin Willows detrimentally relied on Pritzkur's silence.[183] Contrary to Twin Willows' theory, the evidence shows that Pritzkur repeatedly informed Mast and his attorney that compliance with the Notice Condition was needed.[184] Pritzkur, then, was not silent

---

[181] D.I. 157, at 18 (citing *COPI of Del., Inc. v. Kelly*, 1996 WL 633302 (Del. Ch. Oct. 25, 1996)).

[182] *In re Coinmint, LLC*, 261 A.3d 867, 895 (Del. Ch. 2021) (citing *Lehman Brothers Hldgs. Inc. v. Spanish Broad. Sys., Inc.*, 2014 WL 718430, at *9 (Del. Ch. Feb. 25, 2014)).

[183] D.I. 157, at 16-17.

[184] *See supra* notes 19, 23-25, 27, 30, 37 and accompanying text. Pritzkur also repeatedly offered to provide a police escort and did provide one when it was requested. *See supra* notes 20, 40, 45, 49 and accompanying text.

about Twin Willows' failure to comply with the Notice Condition, and Twin Willows' acquiescence theory fails to remove the Notice Condition.[185]

### 4. *Mogavero v. Greenberg* does not Entitle Twin Willows to Relief

Twin Willows relies on *Mogavero v. Greenberg* ("*Mogavero*")[186] to show that that it is entitled to a 12 months' extension of the Agreement because of the "repeated interruptions to its permitting process" caused by Gibbs, and Pritzkur's alleged failure to secure Twin Willows' access to the Property.[187]  It argues that the circumstances here are practically identical to those in *Mogavero*.[188]  *Mogavero* involved a sale agreement for real estate that required the subdivision of property and defendants expressly agreed "to cooperate with [plaintiffs] and to execute and deliver all necessary documents ... in connection with the application for the permits."[189]  When defendants unilaterally withdrew the subdivision application that had been submitted by plaintiffs, the Court found that defendants "unreasonably interfered with [plaintiffs'] efforts" under that agreement and failed to satisfy their

---

[185] The case cited by Twin Willows, *COPI of Del., Inc. v. Kelly*, 1996 WL 633302 (Del. Ch. Oct. 25, 1996), is distinguishable since that case involved standards for a preliminary injunction. *Id.* at *7.

[186] 2007 WL 273843 (Del. Ch. Sept. 12, 2007).

[187] D.I. 138, at 14-22.

[188] *Id.*, at 15 ("The distance between *Mogavero* and Twin Willows is vanishingly small.").

[189] *Mogavero*, *2007* WL 293843, at *3.  The Court determined that the contractual duty to cooperate was "an enhanced and express imposition of the duty inherent in all contracts: the duty of good faith and fair dealing." *Id.*, at *6 (citation omitted).

contractual duty to cooperate.[190]  As relief, the Court ordered defendants to cooperate with the subdivision application process and extended the agreement for one year.[191]

In this case, unlike in *Mogavero*, Pritzkur had no express duty to cooperate with Twin Willows and its inherent duty to act with good faith and dealing was subject to the Conditions.[192]  Further, in *Mogavero*, plaintiffs' performance was expressly subject to obtaining the subdivision approvals while there is no such condition precedent in this case.  Thus, I distinguish *Mogavero from this* case and find that Twin Willows is not entitled to the same relief as order in *Mogavero*.

## C. Twin Willows did not Prove Damages

Twin Willows also seeks damages for breach of contract.[193]  Lawrence Respondents argue that the Agreement provides for an election of damages or specific performance as a remedy.[194]  "Under Delaware law, the elements of a breach of contract claim are: 1) a contractual obligation; 2) a breach of that obligation by

---

[190] *Id.*, at *5, *8.  The application would not be considered without defendants' participation in the application process. *Id.*, at *5.

[191] *Id.*, at *8.

[192] *See supra* note 131 and accompanying text.

[193] D.I. 1, ¶¶ 59-63 (Twin Willows' breach of contract claim only sought equitable relief as a remedy, although its prayer for relief asked for "attorney's fees and damages"); *see also* D.I. 149, at 10.  Its briefing did not address the issue of damages. D.I. 138; D.I. 157.  Arguably, Twin Willows has waived any damages claim by not pursuing it in their arguments, but I address this briefly for the sake of completeness.

[194] D.I. 135, at 12-13; D.I. 155, at 12.  Twin Willows did not respond to this argument. *See* D.I. 157.

the defendant; and 3) resulting damage to the plaintiff."[195]  First, I do not find in this Report that Pritzkur breached any of his obligations under the Agreement.  Further, Twin Willows did not prove any damages resulting from any breach by Pritzkur.[196] Therefore, Twin Willows' claim for damages because of breach of contract fails.[197]

## D. Attorneys' Fees

Twin Willows and Respondents seek attorney's fees.[198]  Neither Twin Willows nor Pritzkur addressed attorneys' fees in their briefing.[199]  "Delaware follows the 'American Rule,' which provides that each party is generally expected to pay its own attorneys' fees regardless of the outcome of the litigation."[200]  Under the American Rule, each party is normally responsible for their own attorney's fees, whatever the outcome of the litigation, absent express statutory language to the

---

[195] *H-M Wexford LLC v. Encorp, Inc*., 832 A.2d 129, 140 (Del. Ch. 2003) (citation omitted).

[196] Mast discussed payments he made over the course of the Agreement, *see* Trial Tr. 297:16-299:1, but the evidence indicated those expenditures were incurred consistent with Twin Willows' obligations under the Agreement (to pursue the Approvals with good faith, diligent efforts) and not as a result of any breach committed by Pritzkur.

[197] Because I find that Twin Willows did not prove a damages claim, I need not reach the Lawrence Respondent's argument about the Agreement providing an election of remedies.

[198] D.I. 149, at 10, 11; *see* D.I. 1, ¶ 63.

[199] *See* D.I. 134; D.I. 138; D.I. 153; D.I. 157. The Lawrence Respondents asked that the Court "reserve decision on attorneys' fees claims for all parties until [Twin Willows'] claims are finally determined." D.I. 155, at 19.

[200] *Shawe v. Elting*, 157 A.3d 142, 149 (Del. 2017) (citation omitted); *see also ATP Tour, Inc. v. Deutscher Tennis Bund*, 91 A.3d 554, 558 (Del. 2014); *Mahani v. Edix Media Grp., Inc.*, 935 A.2d 242, 245 (Del. 2007).

contrary or an equitable doctrine exception, such as the bad faith exception.[201] "The bad faith exception is applied in 'extraordinary circumstances' as a tool to deter abusive litigation and to protect the integrity of the judicial process."[202] I find that there is no basis in this case to justify the extraordinary action of fee shifting and that each party should their own fees in this litigation.[203]

## IV. CONCLUSION

For the reasons set forth above, I recommend that the Court enter judgment in favor of Respondents and also decline to award attorneys' fees. This is a Final Master's Report, and exceptions may be taken under Court of Chancery Rule 144.

Stays of exceptions in the following Master's Reports are LIFTED:

- December 17, 2021 oral Final Master's Report granting in part and denying in part the Joint Motion to Modify a Subpoena and for a Protective Order;[204]

---

[201] Delaware courts have awarded attorney's fees for bad faith when "parties have unnecessarily prolonged or delayed litigation, falsified records or knowingly asserted frivolous claims." *Kaung v. Cole Nat. Corp.*, 884 A.2d 500, 506 (Del. 2005) (quoting *Johnston v. Arbitrium (Cayman Islands) Handels AG*, 720 A.2d 542, 546 (Del. 1998)) (internal quotation marks omitted); *see also RBC Capital Markets, LLC v. Jervis*, 129 A.3d 816, 877 (Del. 2015) (citation omitted).

[202] *Montgomery Cellular Holding Co. v. Dobler*, 880 A.2d 206, 227 (Del. 2005) (citation omitted).

[203] Although I ultimately conclude that Twin Willows' position was not meritorious, its position was not frivolous. *See* D.I. 38. In addition, I recognize that the parties have not meaningfully briefed the issue of attorneys' fees. However, since I find that the record is clear that fee shifting would not be appropriate in this matter, I decline to defer consideration of the attorneys' fees issue, as Lawrence Respondents suggested. *See* D.I. 155, at 19.

[204] D.I. 81; D.I. 87.

- January 13, 2022 oral Final Master's Report denying in part and granting in part Lawrence Respondents' Motion for Protective Order;[205]

- January 12, 2022 Order denying Twin Willows' Motion for Leave to File a Motion for Summary Judgment;[206]

- February 28, 2022 Final Master's Report granting in party and denying in part Twin Willows' Motion to Compel Production of Communications between Robert Penza, Esq. and Trustee Lewis Pritzkur;[207] and

- March 23, 2022 oral Final Master's Report granting in part Twin Willows' Motion to Seal Certain Financial Information and Specify Confidential Treatment.[208]

Exceptions to those Reports may be taken under Court of Chancery Rule 144.

---

[205] D.I. 92; D.I. 96.

[206] D.I. 91.

[207] D.I. 127.

[208] Trial Tr. 11:7-16:8.